**Jeffrey WATTS, Plaintiff-Appellant, Cross-Appellee,**

v.

**James LAURENT, Youth Supervisor II., et al., Defendants-Appellees, Cross-Appellants.**

Nos. 84–2219, 84–2290.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1985.

Decided Sept. 18, 1985.

As Amended Sept. 26, 1985.

Rehearing and Rehearing In Banc Denied Nov. 1, 1985.

Dennis J. Kellogg & Michael Parker, Chicago, Ill., for plaintiff-appellant, cross-appellee.

Vincenzo Chimera, Ill. Atty. Gen. Ofce., Chicago, Ill., for defendants-appellees, cross-appellants.

Before CUDAHY and EASTERBROOK, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Plaintiff, Jeffrey Watts, suffered a severe injury to his left leg and hip while he was an inmate at the Illinois Youth Center located in St. Charles, Illinois. He brought this suit, under 42 U.S.C. § 1983, against several state employees who worked at the Youth Center, alleging they violated his constitutional right to be free from cruel and unusual punishment. After trial, a jury returned verdicts against five defendants, but the trial court granted one of the defendants, Barry Steele, judgment notwithstanding the verdict. The remaining defendants appeal the verdicts against

them, and plaintiff appeals the court's decision in favor of defendant Steele. Plaintiff also attacks the trial court's decision to grant defendants' post-trial motion to clarify the amount of the judgment.

## I.

The Youth Center at St. Charles is designated a medium/maximum security facility, and houses several hundred young criminal offenders. Plaintiff Jeffrey Watts arrived there on July 21, 1981, at which time he had just turned fifteen and weighed about 125 pounds. When residents arrive at the Youth Center, administrators assign them to a cottage according to their disposition and background. Watts was assigned to Pierce Cottage. Employees designated as "youth supervisors" oversee the residents. Four of the five defendants involved in this appeal [1]—Althea Brown, Geri Cejka, James Laurent and Steven VanJoske—were youth supervisors at the Center while Watts was there. Their duties included taking regular head counts, conducting residents to and from meals and classes, keeping daily records on each resident's behavior and administering discipline. The fifth defendant, Barry Steele, acted as a "team leader," and was also responsible for supervising the Teen Center, a recreational facility for the residents.

On January 22, 1982, the residents of Pierce Cottage met outside the cafeteria after lunch. Defendants Brown and Van-Joske were taking a head count before leading the residents back to the cottage, when several residents began running over the field in the direction of Pierce. There was conflicting testimony about whether the students had been given permission to run. One of those running was plaintiff Watts; another was Derrick Greaves. The testimony was in conflict about what happened next. Watts testified he was running when he suddenly found himself on the ground with Greaves on top of him; he claimed Greaves had attacked him. De-

fendants, on the other hand, argued that Watts had slipped on some ice. Watts suffered permanent damage to his hip joint, severely impairing his ability to walk and run.

Plaintiff's theory at trial was that Greaves had threatened Watts at least four times prior to the attack, and that defendants were aware of these threats but took no action to protect him. Greaves had arrived at the Youth Center on November 25, 1981, after being transferred from a minimum security prison at Valley View, Illinois because of his behavior there. During the relevant period, Greaves was about 5'7" tall and weighed approximately 155 pounds. Watts testified at trial that many of the inmates at the Youth Center were members of gangs, and that several gangs had attempted to recruit him although he never joined one. Other testimony indicated that Greaves considered himself the "chief" of one gang, the Black Gangster Disciples. Various evidence supported the inference that the threats and attack could have been gang-related, in that Watts' independence prior to the attack undermined Greaves' authority as a gang chief. Plaintiff's evidence indicated that each of the four defendants who were youth counselors overheard incidents in which Greaves threatened Watts. Although there was no direct evidence that defendant Steele ever overheard such a threat, Watts' theory at trial was that Steele became aware of the danger to Watts through his knowledge of Greaves' record, his opportunity to observe Greaves' behavior and his recognition that Watts was much smaller than Greaves and other residents. All of the defendants testified that they were not aware of any extraordinary animosity between Watts and Greaves. Additional facts are noted in the remainder of this opinion where pertinent.

## II.

Defendants Laurent, Cejka, Brown and VanJoske each argue that the trial court

**1.** Two additional defendants were dismissed from the action prior to trial and another defendant received a directed verdict in her favor at the close of plaintiff's case in chief. Plaintiff does not question these dismissals on appeal.

erred in refusing to grant their motions for judgment notwithstanding the verdict, because no reasonable jury could have found that they violated plaintiff's eighth amendment right to be free from cruel and unusual punishment. More particularly, these defendants deny that they had any knowledge of the danger plaintiff claims was posed by Derrick Greaves.

A motion for judgment notwithstanding the verdict is properly denied where the evidence and all reasonable inferences, when viewed in the light most favorable to the party opposing the motion, is such that reasonable people in a fair and impartial exercise of their judgment may reach different conclusions. *Estate of Davis v. Johnson,* 745 F.2d 1066, 1070 (7th Cir. 1984). This standard implies that a judgment notwithstanding the verdict should rarely be granted where the apparent correctness of the verdict turns on credibility determinations.

██ With these general principles in mind, we turn to the standards governing whether these defendants may be held liable for depriving plaintiff of rights secured under the eighth amendment. In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that deliberate indifference to prisoners' serious medical needs constitutes the unnecessary and wanton infliction of pain that is the hallmark of cruel and unusual punishment. *Id.* at 104, 97 S.Ct. at 291. Since that case, this court has repeatedly recognized that the failure of institutional personal to protect a prisoner from the assaults of other prisoners can also rise to the level of an eighth amendment violation. *See e.g., Estate of Davis v. Johnson,* 745 F.2d at 1071; *Little v. Walker,* 552 F.2d 193, 197 (7th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978). Nevertheless, conduct that simply

amounts to "mere negligence or inadvertence" is insufficient to justify the imposition of liability. *Estate of Davis v. Johnson,* 745 F.2d 1066 at 1070. Rather, "[i]n order to infer callous indifference when an official fails to protect a prisoner from the risk of attack, there must be a 'strong likelihood' rather than a 'mere possibility' that violence will occur." *Id.* at 1071 (quoting *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir.1983)), *cert. denied,* —— U.S. ——, 104 S.Ct. 491, 78 L.Ed.2d 686 (1984). "[A] guard does not have to believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault." *State Bank of St. Charles v. Camic,* 712 F.2d at 1146 (quoting *VunCannon v. Breed,* 391 F.Supp. 1371 (N.D.Cal.1975)). The failure to protect a prisoner on even a single occasion can give rise to liability where it can be inferred that an institutional employee should have realized that there was a "strong likelihood" of an attack.[2] *See Redmond v. Baxley,* 475 F.Supp. 1111, 1117 (E.D.Mich.1979).

Each of the defendants argues that the evidence was insufficient to demonstrate that he or she was aware of a "strong likelihood" that Greaves would attack Watts; indeed, each claimed at trial to have no knowledge of any particular friction between the two boys, much less of the specific threats testified to by Watts. These defendants also stress, as they did before the trial court, the uncontested fact that Watts never told any of the defendants he was afraid of Greaves as a result of the threats, and argue that defendants therefore had no opportunity to take steps to protect him. Because the trial court reviewed the evidence relevant to these

---

**2.** The defendants in this case do not challenge any of the instructions given at trial. They did not ask for an instruction requiring the victim to show that the defendants knew that the victim was at greater or more clearly defined risk than others in the institution, given the usual level of violence among inmates. They also did not ask for an instruction that would have made liability depend on some sort of notice or indication from the victim that there had been threats. We, of course, need not decide whether such instructions would have been appropriate and do not make any suggestions with regard to them.

claims in some detail, we quote from its conclusions with respect to each defendant:

*Althea Brown:* Watts testified that Brown was on duty one morning when the residents of Pierce Cottage lined up for breakfast. Watts ended up first in line. Greaves told Watts that Greaves went first because Greaves was in charge of the cottage. Greaves allegedly said, " 'You're lucky [you're] a shorty and one day you're going to get yours.' " Tr. (February 13, 1984) at 14–15.

Brown asserts that she never overheard this threat, in part because she was supervising twenty-eight residents. Nevertheless, the jury could have disregarded her testimony and inferred from Watts' testimony that she overheard the threat. Coupled with knowledge that gang loyalties led to violence in the facility, Brown could have known enough to show the necessary deliberate indifference. At trial, she testified that she was aware of no gang activity that went unpunished at St. Charles. She appeared knowledgeable in general, however, about gangs and their activities. Given the other reasonable testimony evidencing extensive gang activity at St. Charles and Brown's knowledge of gang behavior, her denials of gang activity may have rung hollow and undermined her credibility.

*Geri Cejka:* Watts testified that Cejka witnessed a fight between Watts and Greaves over a card game. Although Watts was hesitant and uncertain on cross-examination, he stuck to his story that Cejka was on duty and in the same room as Watts and Greaves during the argument. Cejka herself agreed that she disciplined both boys on another occasion for a similar argument.

When Cejka testified, Watts' counsel impeached her by reading from a letter in which she referred to Greaves as a "heavy." She wrote the letter shortly after the January 22nd incident, but the jury could have inferred that she based her opinion in the letter on activity that took place before the incident. Tr. (February 14, 1984) at 50. She explained

that, by "heavy," she meant that Greaves was "bossy" and "wanted his way all the time." *Id.* at 49–51, 59–60. This statement by itself indicated that she considered Greaves to be overly aggressive. The jury could also have decided that "heavy" implied that Greaves was dangerous and that Cejka's belittling of this comment hurt her credibility. If the jury believed Watts' story about Cejka's involvement, she clearly had enough knowledge to conclude that Greaves would give the "shorty" Watts "his."

*James Laurent:* Watts testified that Laurent was present for a threat that took place on the grass outside the cafeteria. Laurent argued that he was talking to students some distance away. In addition, Watts testified that he never told Laurent about the threat or about his fear of Greaves. Again, the jury could have reasonably concluded that, even though talking to other students, Laurent overheard the threat. Since Greaves was much larger than Watts, witnessing such a threat could have alerted Laurent to the danger Greaves posed to Watts.

*Steven VanJoske:* Plaintiff's testimony was that VanJoske was on duty during two of the alleged threats. For one of the threats, he was at the hospital with another resident. The jury could not conclude that he overheard this threat. During the second threat, he was present taking a head count of the Pierce Cottage residents. Although he claims he never overheard the threat, the jury could have inferred from Watts' testimony that VanJoske heard it.

*Watts v. Peters,* No. 82 C 4593 (N.D.Ill. July 2, 1984) (Mem. Opinion at 11–14).

■ It is clear from the summary of the evidence quoted above that reasonable people could have differed about whether each of the defendants had sufficient knowledge to realize that a "strong likelihood" of an attack existed. The plaintiff was apparently a credible witness, whose testimony if believed established that each of the de-

fendants was an eyewitness on at least one occasion to an explicit threat made against Watts by Greaves. Moreover, the evidence taken in a light most favorable to plaintiff established that in evaluating the potential seriousness of that threat each defendant was armed with the knowledge that Greaves was physically much larger than Watts, and that the two lived in the same cottage. Various testimony supported the inference that gang activity permeated the Youth Center and that Greaves was a gang leader while Watts resisted joining any gang. The defendants were directly responsible for observing and supervising residents' behavior, and they were in almost daily contact with both Watts and Greaves. Under these circumstances we agree with the trial court that the evidence was sufficient to demonstrate that defendants Laurent, Cejka, Brown and VanJoske knew there was a strong likelihood of an assault, and therefore the court did not err in refusing to grant a judgment notwithstanding the verdict.

■ The remaining defendant, Barry Steele, also was found liable by the jury, but this result was reversed by a judgment notwithstanding the verdict. Plaintiff contends that the trial court erred in setting aside the verdict because there was substantial evidence establishing that Steele had knowledge of the risk of harm to Watts posed by Derrick Greaves. Defendant Steele was a "Team Leader" at the Youth Center and was also in charge of supervising the Teen Center, a recreation area. As Team Leader, Steele was responsible for receiving disciplinary reports on residents. He presided over disciplinary hearings and decided whether a resident should be moved because of disciplinary infractions or for the resident's own protection. Steele had reviewed the master file on Derrick Greaves, and so knew that he had been transferred to the Youth Center because of behavior problems. Steele also knew Jeffrey Watts quite well, and, in fact, undisputed evidence indicates that Steele made a special effort to develop a relationship with Watts and to make sure Watts was getting along satisfactorily. Plaintiff argues that the court incorrectly reweighed the credibility of the witnesses in rejecting this testimony.

Even if all this evidence is accepted as fact, however, we agree with the district court that a jury could not reasonably conclude that Steele was aware of the risk to Watts but was deliberately indifferent to it. Steele's responsibility for presiding over disciplinary hearings and for making disciplinary or protective segregation decisions establishes only that Steele probably had the power to protect Watts if he thought it necessary to do so. The essential question, however, is whether Steele had any reason to believe such steps were necessary. Plaintiff suggests that Steele could have gained knowledge about the risk to Watts from any one of several sources. In particular, "[t]he jury could have reasonably concluded that since Jeffrey [Watts] spoke with Barry Steele almost on a daily basis, the threats of harm were communicated [or that] since Barry Steele attended staffing meetings he received reports from each defendant concerning Greaves' behavior." Plaintiff's Br. at 34. Moreover, plaintiff contends Steele could have learned of the risk either from Derrick Greaves directly or from Greaves' master file.

While these possibilities are all quite adequate as hypotheses, however, they are insufficient as a basis for liability. Plaintiff presented absolutely no evidence that in any of their daily contacts he ever told Steele about the threats. Nor was there any testimony about what might have been communicated to Steele during staff meetings. The suggestion that Greaves might have announced to Steele his intention to attack Watts rather defies common sense, but, more important, there is no evidence to support it. Finally, there is no evidence that anything in Greaves' master file related to Greaves' hostility towards or altercations with Watts. In short, contrary to plaintiff's assertions, the problem is not that Steele denied knowledge of the risk; it is that Watts never presented evidence that Steele had such knowledge. The most that could be drawn from the plaintiff's evi-

dence, viewing it in the light most favorable to him, is that Steele knew that Greaves had a history of behavior problems, that he was a gang chief, that he was a bully and had some disciplinary problems at the Youth Center. Steele presumably also knew that Watts was smaller than Greaves, was not a gang member and lived in the same cottage. Noticeably lacking, however, is any indication, as there was with the other defendants, that Steele knew of Greaves' particular animosity toward Watts or of the specific threats. Without such evidence we cannot see what might have prompted Steele to inquire further into the situation. Surely Steele was not responsible for segregating every gang bully with a history of misbehavior from every smaller non-gang member resident. In short, the jury could not infer from this evidence that Steele had knowledge of the risk. Thus the court properly granted the judgment notwithstanding the verdict as to defendant Steele.

### III.

Surprisingly, the most difficult issue in this case relates not to liability but to damages: the parties sharply dispute what amount of damages the jury actually awarded to plaintiff. Throughout the trial, defendants were concerned that the jury might improperly find a defendant liable simply because he or she was joined with another defendant against whom the evidence was stronger. To counter this problem, the court stressed to the jury in its instructions that it should consider the case against each defendant separately. In particular, the court instructed the jury that:

[A]lthough there is more than one defendant in this action, it does not follow from that fact that if one is liable that they are all liable. Each one is entitled to a fair consideration of his own defense and is not to be prejudiced by the fact ... that you may find against one or more of the others. The instructions govern the case as to each defendant insofar as they're applicable to him or to her, to the same effect as if he or she were the only defendant in the case and

... *you will decide each defendant's case separately as if it were a separate lawsuit.*

Defendant's Instruction No. 6, Tr., Vol. IV at 549–50 (emphasis added).

In addition to offering this instruction, defendants' counsel suggested that the court use separate verdict forms for each defendant. The verdict form tendered by defendants contains a statement that "We, the jury, find for the plaintiff, Jeffrey Watts and against the defendant, [name of one defendant], and assess compensatory damages in the amount of $_____." The court agreed to use these forms over the objection of plaintiff, who stated that a general verdict form would be simpler. After trial, the jury returned verdicts in favor of plaintiff and against each of the individual defendants. On each individual verdict form, the jury filled in the amount "$40,000" in the blank left for compensatory damages. After the verdicts were rendered, a district judge (who was not the judge who had conducted the trial) entered judgment "for the plaintiff and against each of the defendants Althea Brown, Barry Steele, James Laurent, Geri Cejka, Steven VanJoske for compensatory damages in the sum of $40,000 as to each defendant individually." *Watts v. Peters*, No. 82 CR 4593 (N.D.Ill. February 17, 1984).

Ten days later, the defendants filed a joint motion to "clarify the judgment." They maintained that, although (under their interpretation) the district court had entered a judgment for the plaintiff in the total amount of $200,000, the jury had actually intended to award a total of $40,000 in damages against all of the defendants together. Plaintiff argued in response that the jury intended to award the plaintiff a total of $200,000 in damages, $40,000 assessed against each defendant separately. The district court judge who had heard the case decided in favor of defendants on this issue. Stressing that he had instructed the jury to consider each claim as if it were a separate lawsuit, the judge said he could

read the verdicts in only one way .... As the jury considered each defendant, it concluded that a $40,000 award compensated Watts for his damage. For each verdict, the jury disregarded the other four defendants and decided what amount of money compensated Watts for his loss. In each case, the jury settled on a $40,000 award. The court will vacate its earlier order and enter a judgment against the defendants holding them jointly and severally liable for $40,000. Once Watts receives $40,000, the judgment will compensate him for his loss.

*Watts v. Peters,* No. 82 C 4593 (N.D.Ill. July 2, 1984) (Mem. Opinion at 6–7). The court thus vacated the earlier judgment and held that the defendants Brown, Cejka, Laurent and VanJoske "are together liable to Watts for no more than a total of $40,000. Each one, however, is liable to Watts for up to $40,000 until the judgment is satisfied." *Id.* at 26.

After plaintiff filed his notice of appeal, and the defendants filed their cross-appeal, plaintiff filed a "motion to supplement the record for appeal" in the district court. Watts wanted to supplement the record with the affidavits of two jurors who sat on the case; both stated that the jury determined that plaintiff was entitled to $200,000, $40,000 from each of the five defendants. The court denied the motion, explaining that under FED.R.APP.P. 10, the motion should be brought before this court. The court stated that since plaintiff neglected to offer the affidavits for the district court's consideration in response to defendants' motion to clarify the verdict, adding them to the record "adds nothing to the accuracy or completeness of the record." *Watts v. Peters,* No. 82 C 4593 (N.D.Ill. Nov. 8, 1984). Thereafter, plaintiff filed in this court a "Motion to Supplement Record on Appeal and for Relief under Circuit Rule 35(c)," which we must consider in the course of this opinion.

Plaintiff argues that it is plain from the face of the verdict forms that the jury intended to award plaintiff $40,000 from each defendant individually; and that this conclusion is made crystal clear by the instructions to the jury that it should consider the case against each defendant as if it were a separate lawsuit. Since, if each defendant had been tried separately, each would have been found individually liable for $40,000, plaintiff asserts, the jury merely followed its instructions and accomplished the same result as would have been accomplished after five separate trials (total damages of $200,000) through the use of the separate forms. Defendants, on the other hand, contend that the forms indisputably show that the jury thought $40,000 was fair compensation for the plaintiff and awarded only this amount; since a single lawsuit against a single defendant would have yielded a $40,000 judgment as fair compensation, the fact that five defendants went to trial together should not mean the compensatory award should be increased fivefold. As noted, the trial court agreed with defendants, stating the verdicts could be read in "only one way." We feel compelled to comment that the only thing that seems "clear" about the jury verdicts is that they are ambiguous. Quite obviously, they can be interpreted in at least two ways, and the parties' simplistic assertions to the contrary are not helpful to this court.

There seems to have been some inadequacy in the theoretical development in this case. The trial court decided that the defendants were "jointly and severally liable" for the damages. Yet it permitted verdict forms to go to the jury that at least potentially allowed the jury to apportion damages among the various defendants. It appears to us that defendants' separate jury verdict forms were inherently ambiguous, and that the verdicts would have been open to question in any circumstance where the jury found more than one defendant liable. Thus, particularly in light of the outcome, we believe that the trial court erred in allowing those forms to be used.

Of course, the most obvious solution to our dilemma would be to remand the case for a new trial, at least on damages, using

unambiguous verdict forms. Plaintiff has not requested this form of relief, however, and at oral argument repeatedly declined an opportunity to seek it (although he may not have clearly rejected it).[3] In any event, the whole colloquy with counsel quoted in the margin does not address specifically a new trial *limited to damages*. We have reserved until the end of this opinion consideration of the possibility of a new trial on damages as a possible remedy for a situation brought about in the first instance by defendants' request for ambiguous jury forms. Initially, however, we shall address the decision immediately put to us to choose between the parties' conflicting interpretations of the verdict forms used in the present trial.

Plaintiff argues that since defendants created the problem by using the separate verdict forms over plaintiff's objection, any ambiguity should be construed against defendants. *See, e.g., Drollinger v. Merrell*, 57 Ill.App.3d 792, 798, 15 Ill.Dec. 61, 66, 373 N.E.2d 407, 412 (1978) ("While we realize that it is the function of the court to furnish the jury proper forms of verdict, parties cannot invite error by their conduct or inaction and later assign as error that which is so invited in the event the verdict of the jury is not to their liking.") At the very least, Watts insists, the defendants' failure to ask the court to order the jury to clarify its intention when the verdicts were rendered should be construed as a waiver of the argument that the jury meant to award only $40,000 total damages. There is some authority for this reasoning. For example, in *Herrera v. Valentine*, 653 F.2d 1220 (8th Cir.1981), the jury rendered a verdict for the plaintiff in the amount of $300,000. The jury was polled as to its

**3.** [Court]: I assume under any circumstances here you would not want a new trial?
[Counsel]: Judge, I think the issues have been [indecipherable word] test by the jury. I think that ... I think, uh, that the verdict is clear.
[Court]: I guess that I'm going back to the size of the verdict trial, you'd take the $40,000 rather than a new trial?
[Counsel]: Judge, we were offered that option. We chose to appeal. If the ... The court, quote, clarified the verdict from $200,000 to $40,000.
[Court]: Wouldn't another alternative be to remand this and have the jury ... have a hearing, calling in the jury and ask ...?
[Counsel]: Is there an option at this point? Uh, I don't know the necessity of it, judge, uh, because of the fact that—
[Court]: All right, [unintelligible].
[Counsel]: I assume that might be a possibility.
[Court]: If the only possibility were to retry the case, I take it you would not want that as a remedy?
[Counsel]: Well, I think that it would be a waste of judicial time, but I think ... if, uh....
[Court]: Well, I'm just asking whether you'd just take the $40,000 rather than a new trial?
[Counsel]: We choose not to, your Honor. We think that it is totally unjustified by the evidence.
[Court]: What's unjustified? You choose not to do what?
[Counsel]: We choose not to ... we appealed immediately when the judge ... Judge Decker entered his order, quote, clarifying the verdict from $200,000 to $40,000, we brought this appeal.
[Court]: Yes, I know you did. What I'm trying to figure out what is a proper remedy.
[Counsel]: What a proper remedy is....

[Court]: One possibility is to retry the case.
[Counsel]: Well, uh.
[Court]: I'm not sure you want us to do that?
[Counsel]: There could be an evidentiary hearing as far as the jurors ... that, uh, could be brought in as to their verdict? I'm sure that's a possibility.
[Court]: You already have people who said that they awarded $200,000.
[Counsel]: Pardon me?
[Court]: Jurors filed affidavits that they were awarding $200,000.
[Counsel]: Absolutely, and those are attached to the briefs.
[Court]: Why didn't you ask for clarification?
[Counsel]: There was no necessity, the verdict was clear. The remedy would have been under *Herrera v. Valentine.*
\*      \*      \*      \*      \*      \*
[Court]: You don't want a new trial, then?
[Counsel]: Your Honor, I don't think it's a necessity, judge. I think ... I think the jury has spoken in this case.
Rebuttal: A new attorney speaking on plaintiff's behalf:
[Counsel]: The jury found the $200,000 in damages. Based on those verdict forms and based on their affidavits, we submit them. You have taken the Motion to Supplement the Record under advisement. If you don't consider them, uh, the only remedy is a new trial which would be no remedy at all.
[Court]: You don't want that as a remedy?
[Counsel]: No, your Honor.
[Court]: You don't want it. All right.

verdict and then discharged. The defendants then sought to impeach the jury's verdict with the affidavits of two of the jurors, arguing that the verdict was irreconcilably inconsistent. The inconsistency apparently arose because the jury foreperson stated in response to a question by the trial court that the jury had only found violations of state law, while the verdict form itself indicated that only federal law violations had been found. The court said:

> The clerk read the verdict and the jurors were polled. There is nothing in the record to show that the appellants moved the court back into deliberations to cure any alleged defect in the verdict. After judgment had been entered, the appellants filed their motions for judgment notwithstanding the verdict and for a new trial. Included in these motions were *ex parte* affidavits of two jurors, the clear import of which was to impeach the jury's verdict ....

> If the appellants believed that the jury's verdict was unclear when rendered, the burden rested upon them to move the court, to order the jury back into deliberation. In our view, it is bad practice to wait until after the verdict is rendered and judgment is entered to reappear in court and attempt to impeach a verdict with affidavits that contradict their written verdict. *Cf. University*

*Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 547 & nn. 42–43 (5th Cir.1974).

*Herrera v. Valentine*, 653 F.2d at 1226–27 n. 5.

Plaintiff argues that defendants' motion to clarify the verdict was the equivalent of the defendants' attempt to impeach the verdict in *Herrera*, and that the reasoning in that case should be applied here to prevent the defendants from disputing the plaintiff's conception of the jury's verdict. This approach is tempting, especially since here, unlike *Herrera*, the difficulty in the verdict arose not from a juror's spontaneous remark but from the defendants' drafting of the verdict form. However, in this case there is nowhere a simple determination of the total damages which we can uphold against impeachment. True, the fact that no explicit total appears is due to defendants' submission of forms that have no place for such a total. However, plaintiff compounded the error by failing to point out to the district court what problems might arise from defendants' proposed verdict forms. Plaintiff never objected on the basis that the separate forms would prevent the jury from explicitly assigning a total value to plaintiff's injury, or would create any ambiguity about damages. Rather, he merely stated that a general verdict form would be simpler.[4]

---

**4.** The following colloquy occurred during the jury instruction conference regarding the use of the separate forms proposed by defendants:

> THE COURT: And there are a lot of separate verdicts here, verdict forms.... I'm not sure I'm going to give—is there a Not Guilty as to each one too?
> [DEFENDANTS' ATTORNEY]: That is correct.
> THE COURT: So it's one Guilty and one Not Guilty?
> [DEFENDANTS' ATTORNEY]: Right.
> 　　*　　*　　*　　*　　*　　*
> [PLAINTIFF'S ATTORNEY]: I have a general verdict form for Guilty and Not Guilty.
> THE COURT: You mean for all of them?
> [PLAINTIFF'S ATTORNEY]: Yes.
> THE COURT: I guess that's all right.
> [DEFENDANT'S ATTORNEY]: Your Honor, we would prefer to have separate verdict forms for each party because I think there will be less confusion, and if the jury decides to find—

> THE COURT: Tell me what the difficulty with a general one is if it applies across the board. If it's against—well, I think because of the damages involved and the separate people involved, I can't see any problem with this except the time in signing them.
> [PLAINTIFF'S ATTORNEY]: If [defendants' attorney] is talking about simplification, the easy way is to make two verdict forms, two general ones.
> THE COURT: I have done that and then the jury can be asked to insert the names and so forth and so on. I found out in a recent case there may be some confusion. I don't have any problem with this. Then each one will get some separate attenton, which I guess they're each entitled to.
> [DEFENDANTS' ATTORNEY]: That is what we would prefer.

Tr., Vol. III at 439–440.

Therefore, we are reluctant to simply select the plaintiff's interpretation on the basis of waiver where the ambiguity may well not have been apparent to the defendants (or for that matter to plaintiff) until after a trial judge construed the verdicts as separate rather than joint and several.

Thus, our task remains to determine what the jury decided, based on its instructions and based on what the plaintiff conceives the task before the jury to have been. In making this determination we are guided by the parties' essential agreement that we should treat this case as if it consisted of five separate lawsuits, and by the legal principles that would govern recovery of damages in such a circumstance.

The linchpin of plaintiff's argument is his assertion that, had he brought five separate suits against the five individual defendants, each resulting in a $40,000 judgment, he would have been entitled to collect $40,000 from each of them for a total of $200,000. If this premise is correct, then we agree there is no reason plaintiff should be penalized for having joined all defendants in a single action (although of course the question whether the jury actually intended to award $200,000 here is a separate issue). If, on the other hand, five separate suits resulting in five $40,000 judgments would have yielded plaintiff only the right to collect a single $40,000 award, then the same logic dictates that plaintiff should not receive a windfall simply because all the defendants were present in a single trial.

■■■ This question in turn depends on whether or not these defendants were jointly and severally liable. Federal common law principles of tort and damages govern recovery under section 1983. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Busche v. Burkee*, 649 F.2d 509, 518 (7th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Keyes v. Lauga*, 635 F.2d 330, 336 (5th Cir.1981). It is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury. RE-STATEMENT (SECOND) OF TORTS, §§ 875, 879; *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 & n. 8, 99 S.Ct. 2753, 2756 & n. 8, 61 L.Ed.2d 521 (1979). In such a case the injured party may proceed to judgment against any or all of the responsible actors in a single or in several different actions. *See* RESTATEMENT (SECOND) OF TORTS, § 882. However, the very nature of damages as compensation for injury suffered requires that once the plaintiff has been fully compensated for his injuries by one or more of the tortfeasors, he may not thereafter recover any additional compensation from any of the remaining tortfeasors. *See* RESTATEMENT (SECOND) OF TORTS, § 885(3) and comment e, § 886 and comment a. *See also Dundee Cement Co. v. Howard Pipe and Concrete Products, Inc.*, 722 F.2d 1319, 1324 (7th Cir.1983); *Whitehurst v. Charles Town Hospital*, 626 F.2d 357 (4th Cir.1980).

Thus, if in this case each defendant's independent actions (or failure to take action) produced a single, indivisible injury, and if a lawsuit against any one defendant would have produced a compensatory judgment of $40,000, then the fact that plaintiff might have obtained five such judgments would mean only that those five defendants would be jointly and severally liable for $40,000, *not* that plaintiff could obtain satisfaction with respect to all the judgments for a total award of $200,000. Unfortunately, plaintiff has failed to make his position on this point clear to the court. His briefs refer in passing to the fact that the verdict forms do not mention joint and several liability, but this circumstance does not seem to meet the central issue of what theory plaintiff relied on. At oral argument, plaintiff's attorney was asked how the verdict would be affected if this court were to affirm the grant of judgment notwithstanding the verdict in favor of defendant Steele. He responded that the $200,-000 verdict should be reapportioned among the remaining four defendants, a proposition that is more consistent with a theory of joint and several liability than with a

theory that the $40,000 judgments corresponded to separate, divisible injuries.

Our search of the record discloses little in the plaintiff's evidence, argument or proposed jury instructions to indicate that he ever took the position that his injury was in any way divisible, such that the jury could have apportioned damages according to the degree or type of injury each defendant caused. In reviewing the instructions for the jury during closing argument, plaintiff's attorney told the jury that it would be given verdict forms on which it would identify "an amount of damages" and that it would be up to the jury "to decide on those forms how to apportion the damages among the various defendants." Assuming this reference to apportionment was more than inadvertent, we are at a loss to see on what theory or evidentiary basis the jury was to have made such a determination. Plaintiff never argued that any defendant was more or less culpable (or that they were all equally culpable) for his injuries. Plaintiff never proposed separate damage figures for each defendant, but merely suggested that $150,000 might be appropriate compensation for plaintiff's injuries. In response to the court's questions at oral argument, plaintiff's attorney was unable to offer any justification for segregating damages to correspond to harm that each defendant caused. He merely stated that the jury must have found each defendant equally culpable.

In the absence of any suggestion to the contrary, we must conclude that plaintiff suffered a single, indivisible injury. The nature of the case appears to be such that each defendant's failure to protect plaintiff would have caused plaintiff's injury independently of the other defendants' failure to act, but the injury itself—the attack by Greaves—cannot be apportioned in any sensible way among the several defendants. Thus, this seems to be a classic case for imposing joint and several liability.

If this is correct, then it would make no difference whether plaintiff obtained a separate judgment against each defendant in five separate suits, or obtained five "separate" judgments against the defendant in a single suit. In either event, plaintiff is only entitled to receive from the five defendants jointly the same amount that he could receive from any single defendant individually. Thus, since plaintiff concedes (indeed insists) that a single suit against any individual defendant would have produced a judgment in the amount of $40,000 as fair compensation for his injuries, he is only entitled to receive $40,000 from all of the defendants, jointly and severally. In short, the amount of damages necessary to compensate plaintiff for his injury is the essential first step determination; in this sort of case additional judgments against additional defendants merely provide additional sources of collection, not an enhanced standard of compensation.

Applying these principles to the question of what decision the jury reached, plaintiff could argue (although he has not) that the verdict is properly construed as joint and several, but it is in the amount of $200,000. There are several problems with this approach. First, it is inherently inconsistent with plaintiff's argument that a suit against a single defendant would have yielded a $40,000 judgment. As previously stated, if $40,000 was sufficient compensation for plaintiff's injuries, there is no basis consistent with joint and several liability for allowing a $200,000 judgment merely because additional defendants were joined. For the same reason, if the jury in fact first decided that $200,000 was appropriate compensation, but then apportioned that amount among the several defendants, such apportionment would violate the premise of joint and several liability for a single indivisible injury.

██ Most important, we would have to assume the jury disregarded its instructions. The jury was not instructed to reach a damage figure and then divide it up among the defendants it had found liable. Rather, it was instructed to consider each defendant's case as if it were a separate lawsuit, disregarding the others. If it followed these instructions, we would expect the result that occurred: the amount neces-

sary to compensate the plaintiff was determined to be the same for each defendant. Under this analysis, what the jury might have believed after it reached its separate verdicts about whether or not the judgments would be aggregated is largely irrelevant, just as it would be in a lawsuit against a single defendant where the jury might be aware that other defendants had been or could be sued in separate actions.[5]

■ This is a difficult and unusual case, and its proper resolution is by no means "clear." Nevertheless, because we cannot accept plaintiff's argument without assuming that the jury disregarded its instructions, and without doing violence to accepted principles of joint and several liability, we decline to do so. Nonetheless, we are aware that it was the defendants' initiative which led to the confusion, the effects of which cannot be entirely dispelled no matter how rigorous the after the fact analysis. We can never know with certainty as a matter of fact what was the intention of the original jury and the ultimate responsibility for this must be laid at defendants' feet.

■ We are, therefore, in the interests of justice prepared to offer the plaintiff a new trial on damages, which he may accept or reject at a time and in a manner to be specified by the district court on remand. We are not unaware of the possibilities for injustice inherent in new trials devoted only to damages. *See Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 499–500, 51 S.Ct. 513, 514–

515, 75 L.Ed. 1188 (1931); *MCI Communications Corp. v. A.T. & T. Co.,* 708 F.2d 1081, 1166–68 (7th Cir.1983). We therefore specify conditions which we believe will avoid, or at least minimize, the problems inherent in a procedure whereby a new jury addresses damage questions without knowledge of the evidence introduced in the liability phase of the trial. We therefore require that the parties shall have an opportunity to present to the second jury whatever evidence (through testimony, in summary form or as the district court shall permit) from the liability phase of the trial may be regarded as relevant in any way to the question of damages. To the extent that the parties may be able to stipulate to evidence or summaries of evidence from the liability phase, the proceeding will, of course, be expedited. The trial judge shall apply a broad standard with respect to the relevance of this sort of evidence and there shall be a strong presumption that evidence from the liability phase may be relevant in some way to damages.

The new jury shall be instructed that the relevant issues of liability have been previously decided and shall be instructed as to the legal basis of defendants' liability. These instructions shall not, however, preclude the free presentation of evidence and information from the liability phase to the extent such evidence is relevant, as indicated above, in any way to damages. Should the plaintiff elect to pursue a new trial on damages, he of course agrees to

---

**5.** Plaintiff asks us to consider the affidavits of two jurors which indicate the view that the jury intended to award $200,000. Defendants insist that we should not consider the affidavits on appeal since they were not offered for the district court's consideration prior to the ruling on the defendants' motion for clarification, but only in a motion to supplement the record. *See United States v. Gray,* 611 F.2d 194 (7th Cir. 1979), *cert. denied,* 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980). This case may be somewhat different, however, since plaintiff arguably seeks to use the affidavits in a defensive rather than offensive way. Regardless of the propriety of adding the affidavits to the record on appeal, there is a more fundamental problem which persuades us not to consider them. At best, the

affidavits inform us about the perceptions of two out of six jurors; we have no way of knowing whether these are representative of the other jurors' views about the meaning of the verdict. We think if affidavits (or live testimony) were to be used as a method for resolving the ambiguous verdicts, all (or substantially all) of the jurors would have to be heard from in order for this effort to be probative. And, the jury's expectation, if it existed, that plaintiff was entitled to $200,000 because it had established the liability of five defendants does not justify an award in that amount where the jury had apparently determined that $40,000 was the amount sufficient to compensate the plaintiff in separate suits against the individual defendants.

relinquish any claim to the $40,000 awarded by the first jury.[6]

The judgments against defendants Laurent, Cejka, Brown and VanJoske are therefore AFFIRMED as to liability and, unless the plaintiff shall elect to proceed to a new trial on damages as provided in the opinion, these defendants shall be jointly and severally liable for $40,000. The judgment notwithstanding the verdict for defendant Steele is AFFIRMED. The plaintiff's motion to enlarge the record on appeal is denied. The question of damages is remanded to the district court. If the plaintiff shall elect to undertake a new trial on damages, that proceeding shall be conducted in accordance with this opinion, and the present conditional award of $40,000 shall be vacated. If the plaintiff shall elect to forgo a new trial on damages, the judgment for $40,000, as specified above, shall stand AFFIRMED. Circuit Rule 18 shall not apply.

---

**6.** Both parties and their counsel should be aware of the possible questions involving attorneys' fees in the event of a new trial on damages. *See Marek v. Chesny,* —— U.S. ——, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985); *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).