Gregory DAVIS, Plaintiff,

v.

Thomas PRINGLE, John David Thomas, Daniel Streeter, Chris Cleveland, Paul Flagg, Timothy Adams, Floyd James, individually and in their official capacities, Defendants.

Civ. A. No. C84–914A.

United States District Court, N.D. Georgia, Atlanta Division.

June 30, 1986.

Thomas M. West, West & Cook, Atlanta, Ga., for plaintiff.

Michael J. Bowers, John C. Jones, Atty. Gen. State of Ga., George M. Weaver, Sibley & Weaver, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 for alleged violations of his federal constitutional rights and rights guaranteed by state law. In particular, the plaintiff charges that defendants are liable for injuries which he suffered when stabbed by a fellow inmate at the Metro Correctional Institute in Atlanta, Georgia. Plaintiff claims that the actions of the various defendants who served as prison officials rose to the level of "deliberate indifference to the rights of Plaintiff to be protected under the Eighth and Fourteenth Amendments." Complaint, ¶ 28. Alternatively, plaintiff alleges "the negligent deprivation of Plaintiff's rights to liberty in violation of the Fourteenth Amendment." Complaint ¶ 29. Plaintiff invokes the pendent jurisdiction of this court over his state claim alleging breach of a "duty owed Plaintiff under state law to protect him and

keep him free from harm." Complaint, ¶ 34.[1]

This action is now before the court on defendants' motion for summary judgment. Fed.R.Civ.P. 56(c). Defendants have the burden of proving that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. *See id.* Plaintiff may rely upon his complaint until defendants have produced evidence supporting their contention that there is no genuine issue as to any material fact. At that point, plaintiff must produce evidence supporting the allegations made in his complaint. *See McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 (11th Cir.1981), *cert. denied*, 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982).

## I. STATEMENT OF FACTS.

The events leading up plaintiff's stabbing began on January 7, 1984. Plaintiff lived in a cell in K Building, a building in the Metro Correctional Institute which housed trustees and minimum security prisoners. Melvin Jones was one of plaintiff's roommates. Jones had been brewing "buck," an illegal alcoholic beverage, and was consuming this drink on January 7th, when defendant Flagg approached the cell. Defendant Flagg was a sergeant under the supervision of defendant Adams on the first shift. He approached plaintiff's cell to search plaintiff for suspected possession of narcotics. Flagg Depo. at 22–23.

When defendant Flagg entered the room, "the first thing he saw was Melvin [Jones] sitting there with a gallon of buck between his legs." Davis Depo. at 37. When defendant Flagg asked Jones to turn over the alcohol, Jones began cursing defendant Flagg. Consequently, defendant Flagg called for reinforcements. Before reinforcements arrived, Jones made threatening comments. As defendant Flagg reported the matter, "he kept threatening me and

saying somebody was going to have to die." Flagg Depo. at 21. Defendant Flagg reports that Jones made this statement while looking directly at him. Therefore, defendant Flagg considered the threat to be directed to his person. *Id.* at 21–22.

Defendant Adams provided the necessary reinforcements. He was the lieutenant in charge of the first shift for the entire institution. He found defendant Flagg and plaintiff in the cell with Jones who was cursing wildly. Defendant Adams is unaware whether the invectives were meant for him, plaintiff, or defendant Flagg. Adams Depo. at 30–31. Defendant Adams called in more officers, and they commenced a search of the room for any further contraband. Plaintiff recalls that "during the time they were doing that Melvin [Jones] looked over at me and he said I set him up, you know. And he said that somebody was going to pay for it." Davis Depo. at 38. Consequently, plaintiff requested that defendant Adams explain to Jones that plaintiff was not responsible for the search which resulted in the inadvertent discovery of Jones and his illegal alcohol. Plaintiff recalls that defendant Adams told Jones that plaintiff was not responsible for Jones' apprehension. *Id.* at 39.

Jones was subsequently taken to administrative segregation. The decision to place him in lock-down was made based upon his threat of defendant Flagg and the consequential risk he posed to the security of the institution. Perry Depo. at 33–34.

Investigation of the foregoing incident was commenced by defendant Adams. Although Adams was aware of the threat and generally hostile nature of Jones' behavior, he did not attempt to ascertain whether Jones had actually threatened anyone other than defendant Flagg. Adams Depo. at 14.

---

**1.** Although each defendant is sued in his individual and official capacity, no government entity is named as a party defendant. Liability of defendants' employer, the State of Georgia, may nevertheless be litigated in the context of determining the liability of defendants such as Warden James in their official capacity. *See Kentucky v. Graham*, —— U.S. ——, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985). The court expresses no opinion at this time whether the eleventh amendment would preclude such liability. *See id.,* n. 14.

Indeed, defendant Adams' supervising officer, Officer Perry, concluded that the threats were directed toward defendant Flagg. Perry Depo. at 28–29. Although the plaintiff suspected that Jones might seek to blame him, he never communicated to defendants any fear that his life was threatened. He recalled that he "had been told that Melvin [Jones] said he was going to do this; Melvin said he was going to do that." Davis Depo. at 42. Nevertheless, plaintiff concluded: "It did not worry me. I didn't worry because I hadn't did nothing to him." *Id.*

After waiting for three days in administrative segregation, Jones was finally brought before the disciplinary committee on charges of using an unauthorized drug, possession of alcohol, and being verbally threatening to a correctional officer. *See* Perry Depo., Exhibit 2. The disciplinary committee met on January 10, 1984, and found Jones guilty as charged. *See id.* After being sentenced to ninety days in administrative segregation, Jones was to be accompanied by defendant Pringle from the site of the disciplinary committee hearing to D Building, the site of administrative segregation. Defendant Pringle asked defendant Cleveland, who was assigned to the I.D. section that day, to help him in the movement of Jones and three other disciplinary subjects. Cleveland Depo. at 10. These four inmates were taken from the disciplinary committee hearing to K Building so that they might collect their belongings before moving to the lock-down area. *Id.* Neither defendant Pringle nor defendant Cleveland were aware of the disposition of the disciplinary charges against the inmates they were transporting or the threatening conduct which Jones had previously exhibited. *See* Pringle Depo. at 29, 34. Defendant Flagg was in charge of the first shift in defendant Adams' absence, but did not take any special precautions with regard to Jones.

The story told by the various defendants is somewhat contradictory at this juncture. According to defendants Pringle and Cleveland, they approached the control room of K Building with the four inmates and left Jones by himself in the lobby and in the presence of defendant Thomas, the building officer, and defendant Streeter, a correctional officer being trained in the control room. Pringle Depo. at 13–14; Cleveland Depo., Exhibit 1. Although K Building was an "open range" building so that Jones had the freedom to wander up into any of the ranges through open range doors, *see* James Depo. at 9, defendants Pringle and Cleveland felt that Jones was under the watchful eye of defendant Thomas. Pringle Depo. at 33. Nevertheless, these defendants do not remember telling defendant Thomas specifically to keep an eye on Jones. *Id.* at 33–34. After leaving Jones in the lobby and accompanying the other inmates to their rooms on A Range, defendants Pringle and Cleveland heard screams coming from C Range. Both defendants immediately ran in the direction of the source of the screams. Pringle Depo. at 13–14; Cleveland Depo., Exhibit 1.

Defendant Thomas' recollection of the events leading up to the screams is different. Defendant Thomas recalls that defendants Pringle and Cleveland entered the control room to hand him transfer slips covering the inmates who were being transported to administrative segregation. Thomas Depo. at 22. He does not recall noticing anything on the paperwork given him that would indicate the specific disciplinary charges against the inmates being transported or the threatening conduct previously exhibited by Jones. *Id.* at 22–23. He does recall talking with defendants Pringle and Cleveland in the control room and noticing that Jones had gone up onto C Range. He recalls at that point defendant Streeter stating that Jones had no belongings left on C Range. *Id.* at 26 and Exhibit 1. He remembers that all four defendants were standing in the control room when they first heard the screams from C Range.

The plaintiff himself provides the only testimony regarding what transpired between the time that Jones left the lobby of K Building and the time when the defendants first heard plaintiff screaming. Plaintiff was lying on his bed when he heard

Jones knock on the door to his cell. Davis Depo. at 43. Because cell doors may be locked by individual inmates and opened only by guards with keys or by the control room, *see* James Depo. at 28–31, it was necessary for plaintiff to unlock the door and let Jones into the cell. Jones retrieved some personal toiletry products and left the room with the door cracked. Davis Depo. at 44. Plaintiff proceeded to nod off to sleep. *Id.* However, Jones returned to the cell only moments later and interrogated plaintiff regarding why plaintiff had set him up and where the rest of his alcohol was located. Upon receiving apparently unsatisfactory answers to both questions, Jones pulled out a homemade knife and began to stab plaintiff. *See id.* at 45. Plaintiff screamed and tried to escape, but the door had been closed by Jones. *Id.* at 48.

The actions taken by defendants after they heard the screams are subject to contradictory testimony. Plaintiff's version of the story is that the door eventually opened and plaintiff looked up from the floor only to see defendant Pringle's face.

> I can't recall whether he opened the door with his keys or whether the door came open from the control downstairs. I don't right remember, but I know the door came open and I saw his face. And he looked in and he said, goddamn, and he shut the door back. He pulled the door back shut.

Davis Depo. at 52. Plaintiff testified that while his body was in the way of the door, there was enough space to enter the room. *Id.* Subsequently the door came open again and Jones instructed him to get out of the room before he got killed. *Id.,* 54–55. Plaintiff crawled from his room up to the door of the range only to find the range door locked. Jones cowered over him and hit him with the top of a steel garbage can. However, upon being entreated by fellow inmates to leave plaintiff alone, Jones walked back up the range. Defendants opened the range door and gave plaintiff medical attention. *Id.* at 54–56.

The story told by defendants Pringle and Cleveland is essentially the same with the exception of the allegation that defendant Pringle slammed the door on plaintiff in his moment of need. Defendants Pringle and Cleveland testified that they ran from A Range to C Range. Defendant Pringle was the first to get to the door of the cell. Upon finding it locked he called to defendant Cleveland to have the control room open the door. After the door came open, defendant Pringle recalled seeing a knife and a good deal of blood and trying to enter the cell. He claims that the bodies of Jones and plaintiff were blocking the door and eventually caused the door to shut in his face. Defendants Pringle and Cleveland then rushed to the control room and again opened the cell door. Defendant Pringle closed C Range door along the way in order to seal off the incident from the rest of the institution. Defendant Pringle reached the control room and called for help. He saw plaintiff crawling to the range door when he looked back down the range. Defendants waited until Jones retreated down the range before opening the door and tending to plaintiff. *See* Pringle Depo. at 13–27; Cleveland Depo. at 19–21 and Exhibit 1.

The version of the rescue mission told by defendant Thomas is somewhat at odds with the foregoing stories. He recalls that after noticing that Jones had gone up the range and then hearing screams,

> Officer Pringle ran out and ran up there to C Range. And when he got there, he came back down. He said, "I think the guy's got a knife up there." And when he said, "I think the guy's got a knife up there," I looked through and ran out that direction; I ran out the front of the control room and ran up to the range to peep up there. And when I did, I saw the guys, inmates moving around on the range up there. And there was blood; I could see blood in various places. But I did not see any cutting. I didn't see the inmate himself, but I did see a lot of blood on the range floor up there. At that point, I went back down and ordered

the range doors closed and notified the supervisor what had happened.

Thomas Depo. at 20. Thomas does not recall being personally asked to open the cell door from the control room. *Id.* at 39.

The various recollections of the medical attention given to plaintiff are consistent. Because plaintiff has not alleged that he was inadequately treated, the details of this attention are irrelevant.

## II. CONCLUSIONS OF LAW.

### A. *Federal Claims.*

Plaintiff has alleged that the foregoing actions of defendants constitute deliberate indifference to his personal security in violation of the eighth and fourteenth amendments. In the alternative, plaintiff has alleged negligent deprivation of his liberty in violation of the fourteenth amendment. Plaintiff's alternative allegation of negligent deprivation of his liberty interest is no longer viable in light of the recent decision in *Davidson v. Cannon,* — U.S. —, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).[2] Although plaintiff charges that all defendants except for defendant Cleveland are additionally liable in their supervisory roles, defendants' motion for summary judgment does not address supervisory liability.

■ "In order to state a section 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to constitutional stature." *Williams v. Bennett,* 689 F.2d 1370, 1380 (11th Cir.1982) (quoting *Wright v. El Paso County Jail,* 642 F.2d 134, 136 (5th Cir.1981)). In particular, plaintiff must establish that defendants knew or should have known before the stabbing that his safety was in jeopardy and yet failed to take adequate precau-

tions, that defendants thereafter failed to assist plaintiff during the stabbing incident despite their knowledge of the attack, or that defendants failed to give adequate medical attention after he was stabbed. *Serrano v. Torres,* 764 F.2d 47, 48 (1st Cir.1985). Because plaintiff has not alleged inadequate medical treatment or attention, the court will address only the potential liability because of defendants' actions before and during the attack.

Liability on the part of those individuals responsible for the first shift during which plaintiff was attacked, defendants Adams and Flagg, must be based upon the fact that these individuals knew of a "strong likelihood" rather than a "mere possibility" that Jones would actually cause plaintiff violent harm. *See Estate of Davis v. Johnson,* 745 F.2d 1066, 1071 (7th Cir.1984). Failure to take adequate precautions in the face of such knowledge would necessarily constitute the kind of reckless disregard for the plaintiff's well-being such that defendants could be said to have been callously indifferent to plaintiff's rights. *See Thomas v. Estelle,* 603 F.2d 488, 490 (5th Cir.1979). Foreknowledge of a violent attack upon a particular prisoner is usually provided by evidence of prior attacks by the assailant, e.g., *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), or actual notice to prison officials by the victim that he fears attack. *E.g., Matzker v. Herr,* 748 F.2d 1142 (7th Cir.1984).

■ Although Jones was in a hostile mood on the day he was caught with the illegal alcohol and no doubt made threatening statements which could have been directed to anyone in his presence, there is no evidence in the record from which the court could conclude that defendants' had knowledge of a strong likelihood that Jones would violently attack the plaintiff. While Jones was apparently a troublemaker and a hothead, there is no evidence in the record

---

**2.** The Court in *Davidson v. Cannon* had no occasion to pass upon the extent to which prison officials had been deliberately indifferent to the personal security of the plaintiff. Consequently, this case is binding only for the proposition that an allegation of negligent deprivation of a prisoner's liberty interest in personal security does not state a claim for relief under 42 U.S.C. § 1983.

that he had a prior record of attacking fellow inmates. The only particularized threat of which defendants had knowledge was plaintiff's threat directed to defendant Flagg. Because of this threat and his generally hostile behavior, Jones was quite properly placed in administrative segregation immediately.

Plaintiff pins his hopes upon the recriminating statement allegedly made by Jones after being caught with illegal alcohol. Although this court must assume that defendant Adams had knowledge of this statement in light of the fact that he complied with plaintiff's request to inform Jones that plaintiff had not been an informant, this evidence shows at best a mere possibility that Jones might take out his hostilities upon plaintiff. Defendant Adams may have been unreasonable in treating this statement as merely one in a number of hateful accusations and threats made at everyone in the cell by Jones, but failure to exercise that degree of care which a reasonable man would have exercised does not rise to the level of callous indifference.

This court's conclusion regarding the knowledge which defendants can be held to have had of the impending threat is supported by plaintiff's testimony. Plaintiff admits never communicating a fear of bodily harm to defendants. Indeed, plaintiff's own testimony shows that he was not worried about such harm from Jones. Plaintiff was so nonplussed by the idea of violent retribution that he was able to drift off to sleep with his back to an open door through which Jones had just walked. Of course, plaintiff's behavior is not determinative of the knowledge defendants had or should have had of impending harm. The court recognizes that plaintiff himself may have acted so nonchalantly because he felt that Jones was unarmed and under the watchful eye of prison guards. *See* Davis Aff., ¶¶ 2–3. Nevertheless, plaintiff himself never indicated any fear from the threat of physical harm by Jones. If plaintiff did not readily and immediately perceive a threat of violence, then it is unreasonable to conclude that defendants should have been aware of a substantial risk of violence.

Liability on the part of defendant James may be based upon a showing that there was a pervasive risk of harm to plaintiff in the Metro Correctional Institute. *See Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981) (evidence established a "reign of terror" at the institution). The Fourth Circuit has defined this ever present risk as follows:

> A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution.... It is enough that violence and sexual assaults occur ... with sufficient frequency that ... prisoners ... are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures....
>
> It is not necessary to show that all prisoners suffer a pervasive risk of harm. It is enough that an identifiable group of prisoners do, if the complainant is a member of that group.

*Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980).

The record does not disclose a pervasive risk of harm as defined above. In fact, plaintiff has not made any effort to establish that such a risk exists. There were approximately two stabbings which occurred during the tenure of defendant James as warden, one of which may have occurred after the stabbing which is at issue in this case. James Depo. at 40. The particular group of which plaintiff was a member, minimum security and trustees in K Building, has also not been shown to have been especially vulnerable to inmate assault.

Of course, defendant James may also be held liable for policies which he promulgated which are themselves deliberately indifferent to plaintiff's personal security. *See Ancata v. Prison Health Services,*

*Inc.*, 769 F.2d 700, 706 (11th Cir.1985). For example, plaintiff has argued that defendant James was deliberately indifferent in his policy of rotating personnel from one building to another. This policy coupled with the authorization of inmate transfers by prison officials who harbor no knowledge of the particular inmates disciplinary charges or proclivity to hostility is said by plaintiff itself to constitute deliberate indifference to his personal security. The open range policy which allowed Jones to flee into C Range, obtain a weapon, and attack plaintiff is also said to have been a deliberately indifferent policy. However, because this court has concluded that defendants cannot be held to have known of a substantial risk of physical harm to plaintiff, any policies which themselves contributed to the lack of precaution cannot perforce be said to have been deliberately indifferent to the specific security needs of plaintiff.

In short, the evidence shows at best that defendants were not as sensitive to the nuances of inmate recrimination and retribution as one might desire. There is no doubt that greater sensitivity would have thwarted the attack upon plaintiff. Defendant Pringle has testified that he would not have left Jones in the lobby had he known of Jones' hostile conduct only days before. Pringle Depo. at 40–41. Nevertheless, this evidences a lack of due care on the part of defendants rather than a callous indifference to a known risk. As Justice O'Connor recently made clear "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments clause...." *Whitley v. Albers,* — U.S. —, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

While the relatively undisputed facts surrounding the failure of defendants to take precautionary measures establishes as a matter of law that defendants were entitled to summary judgment on that issue, there is enough disputed evidence to create a jury question regarding the actual response to the stabbing attack itself. Liability under the eighth amendment may be established when prison officials refuse to investigate or help a prisoner when he cries for help. *See Stokes v. Delcambre,* 710 F.2d 1120, 1125 (5th Cir.1983). A jury could conclude that defendants Pringle, Cleveland, Thomas and Streeter were callously indifferent to the known attack upon plaintiff if the testimony of plaintiff and of defendant Thomas is to be believed. The evidence most favorable to plaintiff may be interpreted as follows. Defendants investigated the source of the trouble upon hearing the screams. In particular, defendant Pringle rushed to the cell and ascertained that the plaintiff was being stabbed by Jones. Nevertheless, defendants shut the range door and waited to help until such time as they saw plaintiff crawling towards the door with Jones nowhere in sight. If plaintiff's testimony is given credit, defendant Pringle actually locked plaintiff in his cell with a fellow inmate who was obviously stabbing him repeatedly. Such reaction in the face of a known attack upon an inmate may constitute callous and conscious indifference. Therefore, those defendants present during the attack may well be held personally liable for their failure to respond. Although defendants Adams, Flagg and James did not participate in the response to the attack, their supervisory liability remains unaddressed by defendants' motion.

### B. *State Claims.*

Plaintiff has asserted a pendent state claim that defendants breached a duty owed to him under state law to protect him and keep him free from harm. Because this claim sounds in negligence, the foregoing conclusions regarding the conduct of defendants are not necessarily dispositive. It may be that a jury could conclude that the defendants' conduct was negligent. Nevertheless, defendants assert that they are entitled to immunity under Georgia law. As the Georgia Court of Appeals has noted,

It is a well-established principle that a public official who fails to perform purely ministerial duties required by law is

subject to an action for damages by one who is injured by his omission. However, it is equally well established that "where an officer is invested with a discretion and is empowered to exercise his judgment in matters brought before him, he is sometimes called a quasi-judicial officer, and when so acting he is usually given immunity from liability to persons who may be injured as the result of an erroneous decision; provided the acts complained of are done within the scope of the officer's authority, and without willfulness, malice, or corruption."

*Gray v. Linahan,* 157 Ga.App. 227, 228, 276 S.E.2d 894 (1981) (quoting *Gormley v. State,* 54 Ga.App. 843, 847–48, 189 S.E. 288 (1936)). In order to avail themselves of the protection of this quasi-immunity, defendants must establish that they were officers exercising their discretion.

█ With respect to those defendants who are implicated in failing to protect plaintiff from harm, it is clear that defendants Flagg, Adams and James were serving as officers of the institution. Furthermore, the decision not to take further precautions with respect to plaintiff's safety and defendant James' policies which may be said to have contributed to the lack of precaution stem from an exercise in discretionary judgment. This is made absolutely clear by the case of *Gray v. Linahan. See id.* In that case the warden and three subordinate officials of Georgia Women's Correctional Institution were sued by inmates who suffered an assault by fellow inmates. They contended that defendants' failure to protect them rendered defendants liable for breach of their duty to provide for inmate safety. The Georgia Court of Appeals defined quasi-immunity of public officials with the statement quoted above and concluded:

> The omissions complained of in this case cannot reasonably be classified as failures to provide purely ministerial duties; rather, each was the product of an exercise of judgment in an area which was well within the scope of the defendants' authority and responsibility as prison officials. It follows that they cannot be

held liable for the plaintiffs' injuries in the absence of evidence that they acted in a spirit of willfulness, maliciousness, or corruption.... defendant did not act in a spirit of willfulness, malice, or corruption, or in total disregard for the plaintiffs' safety.

*Id.* at 228–29, 276 S.E.2d 894. Because no willfulness or malice has been shown and this court has concluded that there was not a total disregard for plaintiffs' safety, those defendants responsible for protecting plaintiff from violent attack are immune from any claim under Georgia law that they breached their duty to prevent assaults upon plaintiff.

█ The same cannot be said for the conduct of defendants in responding to plaintiff's attack. Whether they are considered officers or mere employees, defendants Pringle, Cleveland, Thomas and Streeter were discharging ministerial duties in their guarding and protecting inmates. Moreover, those defendants whose policies may be said to have contributed to the allegedly inadequate response to the attack, defendants Flagg, Adams and James, were also discharging non-discretionary duties. For example, defendant James was enjoined to develop comprehensive plans for incidents such as plaintiff's stabbing. *See* Georgia Department of Corrections Regulation § 125–2–4–01(2), *quoted in* Plaintiff's Brief in Response to Defendants' Motion, at 27. This conclusion is bolstered by decisions of the Georgia Court of Appeals wherein that court has consistently held jailers subject to negligence suits for failure to render the jail safe from fires. *See Winston v. City of Austell,* 123 Ga.App. 183, 184, 179 S.E.2d 665 (1971); *Thomas v. Williams,* 105 Ga.App. 321, 326, 124 S.E.2d 409 (1962); *see generally* McManis, *Personal Liability of State Officials Under State and Federal Law,* 9 Ga.L.Rev. 821, 828 (1975).

### III. CONCLUSION.

For the foregoing reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.