**ESTATE OF Clyde DAVIS, Deceased, William H. Davis, Administrator, Plaintiff-Appellee,**

**v.**

**Marguerite JOHNSON, Defendant-Appellant.**

**No. 83–2631.**

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1984.

Decided Sept. 27, 1984.

Paul Brown, Heyl, Royster, Voelker & Allen, Springfield, Ill., for defendant-appellant.

William J. Harte, Ltd., Chicago, Ill., for plaintiff-appellee.

Before PELL and BAUER, Circuit Judges, and JAMESON, Senior District Judge.[*]

PELL, Circuit Judge.

Clyde Davis, a fifty-nine year old and evidently senile man, was murdered by a fellow detainee after the two were placed in a single "holding cell" at the City of Decatur, Illinois, police department headquarters. Clyde Davis' son, acting in his capacity as administrator of his father's estate, brought this action in federal district court pursuant to 42 U.S.C. § 1983. The complaint alleged that defendant Marguerite Johnson, an information clerk at the Decatur police headquarters, deprived Clyde Davis of rights secured by the Eighth Amendment to the federal Constitution. The complaint also asserted pendent tort claims under the wrongful death and survival statutes of Illinois. A jury returned a verdict against defendant in the amount of $875,000. Johnson thereupon filed a post-trial motion for judgment not-withstanding the verdict, which the district court denied. On appeal, Johnson assigns two errors with respect to the denial of her motion notwithstanding the verdict. First, she maintains that the district court should have granted the motion with respect to all counts of the complaint because there was insufficient evidence to go to the jury concerning the mental states requisite to her liability. Second, with respect to the wrongful death count in particular, Johnson argues the district court erred when it failed to enter judgment in her favor because there was no evidence Davis' son suffered pecuniary injury when his father died. We consider the two assignments of error in turn.

## I. FACTS

Clyde Davis was fifty-nine years old at the time of his death and had been institutionalized in state hospitals or nursing homes for most of the latter half of his life. He was diagnosed as a "catatonic schizophrenic," an illness which left him largely withdrawn and at times severely bewildered. Davis experienced difficulty performing basic tasks such as eating, bathing himself, and taking care of personal hygiene.

Clyde Davis had only one child, William, who was twenty-eight when his father died. William was raised by his mother and never lived with his father. William had no control over the institutions in which his father was placed, and he did not pay for his father's care. During the last decade of his father's life, he visited his father on the average of once a month. Davis spoke to his son on only two occasions during that ten year period, and those communications were extremely terse. During the last ten years of his father's life, William received no financial support from his father, and he had no expectation that his father would recover or ever be able to contribute to his support.

On the evening of April 4, 1978, Davis was left unattended, and he wandered

---

away from Nightingale Manor, a nursing home located in Decatur. Shortly after 10:00 p.m., Decatur municipal police officer Don Allsop was ordered to investigate a car which had rolled down an embankment adjacent to a Decatur street. Allsop found Davis sitting in the car and recognized the car as one that had been reported stolen. Allsop placed Davis under arrest for possession of a stolen vehicle and transferred custody of Davis to Richard Hazen and Leo Dauer, two municipal patrolmen who had arrived at the scene. Hazen and Dauer transported Davis to police headquarters. At trial, these two patrolmen described Davis as frail, unresponsive, and senile.

George Parks was the information clerk on duty when Hazen and Dauer brought Davis to police headquarters. The duties of an information clerk, according to Decatur police department regulations, include booking prisoners, making periodic checks of the holding cells, disseminating information to the public, dispatching police officers, and maintaining files. Parks had read a missing persons report concerning Clyde Davis, and he asked Davis to identify himself. Davis, however, made no response. Hazen and Dauer then took Davis to the holding cells of the headquarters, but they noticed that each of the three male cells already held at least one person. The officers then started toward the single female cell, but Parks informed them that that cell was also occupied. Hazen and Dauer returned Davis to the male section and placed him in a cell which at that time was occupied by one Donald Nobles. Neither Hazen nor Dauer noticed "anything unusual about Donald Nobles." Hazen, however, revealed at trial that, as they placed Davis in the cell, Nobles grinned and said, "So, you're going to put him in with me, huh?" Dauer returned to the cell a few minutes later to give Davis a jacket he had forgotten. Dauer stated that Davis took the jacket from him and apparently recognized the jacket as his. Dauer at this point heard no unusual noises in the cell area and he perceived no unusual activity. A prisoner being held in the male section testified at trial that he witnessed the placement of Davis in the cell with Donald Nobles. According to the prisoner, each officer supported Davis on one side and pulled him through the corridor. Davis' feet apparently dragged behind him and his pants fell below his knees.

Donald Nobles had been arrested in the morning hours of April 4, 1978, for the fatal shooting of his girlfriend. Detective George Hunk of the Decatur police department interviewed Nobles in the afternoon of April 4 and testified that Nobles exhibited a placid demeanor. Hunk also testified that Nobles' appearance was "not unusual" and that Nobles was neither aggressive nor violent at any time during the interview. Parks stated at trial that he observed no violent propensities in Nobles and he further stated that he had "no reason to keep [Nobles] separated [from the other prisoners.]" Nobles, however, testified that he had smoked marijuana and "angel dust" prior to murdering his girlfriend. The effects of these drugs had not yet dissipated when Nobles was incarcerated at the Decatur police headquarters. According to Nobles, these drugs made him "hallucinate" and be "very paranoid," the latter expression being a synonym for "being scared of everyone." Nobles also stated that during the afternoon hours he attempted suicide by running his head against the cell's bars and by striking his wrists against the cell's sink. Nobles admitted, however, that no officer knew of these actions. A prisoner who had seen Nobles strike his hands against the fixtures in his cell confirmed that no officer was aware of Nobles' activity.

At approximately 10:45 p.m., Marguerite Johnson, appellant in this case, arrived at the Decatur police headquarters to relieve Parks, whose shift as information clerk ended at 11:00 p.m. Johnson had been on duty during the early morning hours of April 4 when Nobles was originally brought to police headquarters following the shooting of his girlfriend. Johnson stated that Nobles "seemed very docile" and created no disturbances during her shift on the morning of April 4. Two offi-

cers on duty at 10:55 p.m. informed Johnson that the prisoner incarcerated in the cell occupied by Nobles matched the description of Clyde Davis given in the police missing persons report. The officers and Johnson walked to the cell area to confirm the identification, but the officer leading the group advised Johnson not to proceed any further because Davis had dropped his pants and was exposing his genitals. The officer addressed Davis by first and last name, but Davis gave no response. Directly thereafter, Johnson reported her belief about Davis' identity to Sergeant Stolz, the commanding officer in charge of the shift that had just ended. Stolz acknowledged that the man in custody probably was Davis, but for reasons not explained in the record, he failed to pursue the matter and he left the police station for home. Johnson, however, continued to pursue the matter, mentioning to Lieutenant Coventry, the commanding officer for her shift, that the man in the holding area matched the description of Clyde Davis. Coventry told Johnson that Davis was suspected of possessing a stolen car, and he instructed her to have Davis transferred to the county jail. Johnson responded that the workers at the county facility were waxing the jail's floors and that the facility was not currently receiving prisoners. Coventry then stated, "As soon as they are done, we will take him."

Thereafter Johnson attended to her normal duties, including booking new prisoners and answering telephone calls. At approximately 11:30 p.m., Johnson and five officers assembled in the booking area. Each agreed at trial that they would have heard commotion in the holding area from their location in the booking office, but they testified that none in fact perceived any noise coming from the cells. Two prisoners in the cell area, one in the male section and one in the female section, testified that they heard a fight going on in the holding cells. The prisoner in the male section stated he heard the sounds of a person being beaten approximately ten to fifteen minutes after Davis was placed in Nobles' cell. The prisoner testified that

the sounds lasted between thirty and forty-five minutes. He also stated that another prisoner in the male area yelled, "Leave him alone." The prisoner in the female area, a male who was being kept apart from his coconspirator in the male section, testified that the fight lasted between ten and fifteen minutes. He estimated that he heard the sounds of the fight at approximately 10:15 p.m. One police officer testified at trial that sounds would have to have been loud if a prisoner in the female area had perceived them.

Between 11:00 and 11:45 p.m., neither Johnson nor any of the officers inspected the cell area. This violated Decatur police department regulations, which prescribe that such an inspection should, under normal circumstances, take place every half hour. At approximately 11:45 p.m., two officers brought a new prisoner to the male area. At the request of Johnson, they checked on Davis and discovered him dead and lying on the floor of his cell.

Nobles testified that he did not comprehend his act of violence. At trial Nobles stated, "I thought they was handing him something to do something to me. The next thing I know I was—ran up and started choking him and shaking him and banging him against the wall. Then I realized he didn't have nothing. I was just thinking that—I let him go, and he fell to the floor real hard." Nobles was later convicted of the murder of Clyde Davis.

William Davis filed a four-count complaint in federal district court, naming as defendants, inter alia, the Nightingale Manor nursing home, officer Allsop, officers Hazen and Dauer, Marguerite Johnson, the Decatur police chief, the city's mayor, and the city itself. William Davis was represented at this time by attorney Richard Doyle. The municipal defendants were represented by attorney Paul Bown and the nursing home retained attorney Jack Martin as counsel. On various occasions, Doyle and William Davis discussed settling the case, and they specifically discussed settling with some defendants separately. On August 14, 1981, William Davis

called Doyle's office and stated he would "settle for twenty-five thousand clear." Doyle was not in the office, but one of his secretaries relayed the message to him. Doyle did not telephone William Davis to confirm the settlement offer, but rather talked to Bown and Martin to convey the offer. Doyle stated that Bown and Martin agreed to settle and that Martin was to draft releases for William Davis to sign. The next day, however, William Davis called Doyle and stated that he only intended to settle with the City of Decatur and the police officers. According to William Davis, he felt compelled to settle because Doyle had demanded payments for expenses in excess of those he could afford. Defendants in this action filed a motion to "Enforce Settlement," but the trial judge denied the motion, stating that enforcement would be an abuse of discretion.

Prior to trial, in January 1983, a number of defendants moved for and were granted summary judgment. The nursing home settled on July 21, 1982, for $10,000. When trial commenced, only Officer Hazen, Officer Dauer, and Marguerite Johnson remained in the case as defendants. The jury returned a verdict in favor of the officers, but it found against Marguerite Johnson on all four counts. Count 1, a Section 1983 claim, sought actual and punitive damages for defendant's violation of Davis' rights secured by the Eighth Amendment. The jury returned an award of $525,000 on this count. Count 2, also brought under Section 1983, sought recovery for Davis' pain and suffering. The jury awarded plaintiff $50,000 on this count. On Count 3, a pendent wrongful death claim, the jury returned an award of $300,000. Finally, Count 4 sought recovery for Davis' pain and suffering, this time under the Illinois survival act. The jury returned a verdict of $50,000 on this final count.

## II. DISCUSSION

A. Judgment Notwithstanding the Verdict: The Issue of Appellant's State of Mind

At the close of all the evidence, appellant Johnson moved for a directed verdict on the ground that the evidence introduced at trial could not support a finding that she possessed the mental states requisite to liability under any of the four counts. The trial court denied the motion. After the jury determined liability, appellant filed a post-trial motion for entry of judgment notwithstanding the verdict, but the trial court also denied that motion. Appellant now asks this court to reverse the trial court's denial of the motion for judgment notwithstanding the verdict.

In *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir.1984), this court stated that a "demanding standard" governs the granting of a motion for entry of judgment notwithstanding the verdict, and we articulated that standard as follows: "The motion should be denied where the evidence, along with all inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that [people] in a fair and impartial exercise of their judgment may reach different conclusions." *Id.* at 1323–24, *quoting Kolb v. Chrysler Corp.*, 661 F.2d 1137, 1140 (7th Cir.1981). Despite the stringency of this standard, we are persuaded that we must reverse the district court's denial of appellant's motion for judgment notwithstanding the verdict with respect to Counts 1 and 2. With respect to Counts 3 and 4, the pendent negligence claims, however, we agree with the district court that the jury could find that appellant possessed the state of mind requisite to liability.

■ Counts 1 and 2 were brought pursuant to Section 1983 and alleged that appellant violated Davis' Eighth Amendment rights. As we recently stated· in *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1145–46 (7th Cir.1983), mere negligence or inadvertence on the part of state officials is not sufficient to sustain a violation of the Eighth Amendment. *See United States ex rel. Miller v. Twomey*, 479 F.2d 701, 719–21 (7th Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39

L.Ed.2d 102 (1974). Rather, as the jury was instructed, state officials must act in callous indifference to the dangers faced by a prisoner before they will incur liability under Section 1983 for an Eighth Amendment violation. After carefully reviewing the record, we believe that people in a fair and impartial exercise of their judgment could reach only one conclusion, namely that appellant lacked callous indifference to the danger faced by Davis.

■ Intentional infliction of cruel punishment will also suffice for violation of the Eighth Amendment. *Little v. Walker*, 552 F.2d 193 (7th Cir.1977). The jury was not instructed on this aspect of an Eighth Amendment violation, nor would the record have supported a finding of intentional misconduct on the part of appellant.

■ Appellant came on duty after Davis had been placed in Nobles' cell. She was not present to see Davis dragged to his cell, as one prisoner reported the incident, nor did she hear Nobles' arguably threatening comment, "So, you're going to put him in with me, huh?"[1] Although appellant was on duty at the time Nobles was brought to police headquarters in the early morning hours of April 4, there is no evidence in the record that she knew Nobles had violent propensities. In fact, she as well as her colleagues at police headquarters described Nobles as placid and "very docile." Although Nobles apparently engaged in violent behavior while incarcerated, Nobles as well as one of his fellow prisoners testified that none of the officers knew of that behavior.

In order to infer callous indifference when an official fails to protect a prisoner from the risk of attack, there must be a "strong likelihood" rather than a "mere possibility" that violence will occur. *State Bank of St. Charles, supra,* at 1146, *citing United States ex rel. Miller v. Twomey,*

*supra.* We find the record bereft of any evidence which would have led appellant to know there was a "strong likelihood" of violence. The attack on Davis was an act of random violence, and such violence is not a highly probable event. Violence generally occurs for a reason such as the exaction of revenge or the desire to silence a witness. Appellant only knew that Nobles was incarcerated because he allegedly murdered his girlfriend, and such a murder is generally a crime of passion. Based on the record, the probability that Nobles would blindly attack the first person placed in his cell was low. Moreover, a jail lock-up is one of the least probable places for violence to occur. While in jail, prisoners have a strong incentive to behave well so as to influence favorably bail and other pretrial decisions. Furthermore, an assailant locked in a cell with only one other prisoner can hardly hope to avoid identification as the attacker of his cellmate. For these reasons, and in light of the fact that appellant was unaware of Nobles' violent outbursts in jail, we find it difficult to see how appellant knew that Davis was subject to the "strong likelihood" of violence at the hands of Nobles.

Appellee maintains that even if Mrs. Johnson did not manifest callous indifference to the safety of Davis when she failed to watch closely the cell in which Davis was placed, there was evidence of callous indifference when she failed to check on Davis after sounds of a beating were audible. Appellee's argument is based upon small shreds of evidence. First, one prisoner in the male holding area stated that he heard sounds of a fight in the cell block. The record, however, does not indicate that those sounds penetrated to the booking area where appellant sat with her colleagues. In fact, appellant as well as several other officers on duty that evening explicitly testified that they perceived no

---

1. Appellee cites a Decatur Police Department Regulation to the effect that "[n]o detainee ... who shows evidence of [mental disorder] shall be housed in any municipal jail." In light of the fact that Mrs. Johnson was not present when Davis was placed in Nobles' cell, it is difficult to

understand how citation of this regulation advances appellee's case. In any event, Johnson's disregard of this regulation, based upon the record of this case, would only support a finding of negligence, not a finding of callous indifference. *See infra.*

unusual sounds emanating from the male area. Second, one prisoner in the female holding area said that he heard the sounds of a beating, and one officer stated that such sounds would have to be loud if they were audible to that prisoner. The testimony of the prisoner in the female area, however, is strikingly wanting in detail. In particular, the prisoner was unable to establish accurately the time at which he heard the sounds of a beating. The prisoner could only speculate that he heard the sounds at 10:15 p.m., a full half-hour before Davis even arrived at police headquarters. Accordingly, we believe that the two prisoners' testimony was of such inferior quality that it cannot support the jury's verdict on the Section 1983 counts.

Not only do we find the evidence supporting a finding of callous indifference to be negligible, we find overwhelming evidence on record to the effect that appellant was mindful of Davis' needs and took conscientious steps to ensure his well-being. Appellant paid close attention to the information contained in the missing persons report, and she made her belief concerning Davis' identity known to the commanding officer of the second shift. When he failed to take action, appellant pursued the matter further, bringing her suspicion to the attention of her direct commanding officer. Appellant was prepared to have Davis transferred to the county jail in accordance with her commanding officer's instructions. At 11:45 p.m., when officers took a new prisoner to the male area, it was appellant who instructed the officers to check on the welfare of Davis. In our opinion, this evidence, when weighed against the minimal evidence of callous indifference offered by plaintiff at trial, can reasonably support only one conclusion, namely that appellant lacked the mental state requisite to violating the rights of Davis secured by the Eighth Amendment.

Although we find the record bereft of evidence showing callous indifference on the part of appellant, we cannot say the same about a showing of negligence supporting the verdict under Counts 3 and 4.

Decatur Police Department Regulations prescribe a minimum of two cell inspections per hour and constant supervision of detainees who show signs of mental disorder. The regulations are evidence of appellant's standard of care, and jurors in a fair and impartial exercise of their judgment could certainly reach the conclusion that appellant's failure to abide by those regulations constituted a breach of her duty of care. Appellant contends that even if a breach of duty were shown, another essential element of liability under a theory of negligence, namely proximate cause, is lacking. According to appellant, her failure to make the prescribed inspections was of no moment because Davis was already dead at 11:30 p.m. This argument must fail, however, in view of the latter regulation. Plainly there is a proximate connection between Davis' death and appellant's failure to supervise Davis constantly. Moreover, even if we were to ignore the latter regulation, we would still rule against appellant. We believe that there was enough uncertainty regarding the duration of the fatal beating and the time it commenced that a jury could reasonably reach different conclusions concerning the element of proximate cause. The prisoner in the male holding area estimated the duration of the beatings at thirty to forty-five minutes. Nobles himself stated that the beating began two or three minutes after the officers brought Davis to his cell, but this contradicts the officers' testimony that Davis was still alive at 11:00 p.m. The jury knew that the beating took place sometime between 11:00 and 11:45 p.m. In light of the conflicting testimony concerning the beating, the jury could have concluded that appellant's inspection at 11:30 p.m. might have prevented or lessened the severity of Davis' injuries.

**B. Judgment Notwithstanding the Verdict: The Issue of Pecuniary Injury**

Count 3 of the complaint prayed for damages pursuant to Illinois' Wrongful Death Act, Ill.Rev.Stat. ch. 70, §§ 1–2.2 (1981). The court alleged that appellant's negligence caused the death of Clyde Davis and

that as a result of Clyde's death, his only "next of kin," William Davis, sustained "pecuniary injury" compensable under the Act. In her motion for a directed verdict at the conclusion of all the evidence, appellant argued there was insufficient evidence introduced at trial to prove that William Davis suffered any pecuniary injury. The district court denied the motion, and the jury ultimately awarded William Davis $300,000 on the count. Appellant renewed her claim of insufficient evidence on a post-trial motion for entry of judgment notwithstanding the verdict, but the district court also denied that motion. Appellant now assigns error to the district court rulings concerning the sufficiency of the evidence.

In pertinent part, the Illinois Wrongful Death Act states:

> [T]he amount recovered ... shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person and in every such action the jury may give such damages as they deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, to the surviving spouse or next of kin of such deceased person.

Under Illinois law, "next of kin" is a broadly defined term encompassing "blood relatives ... in existence at the time of the death of the deceased who would take his personal property in case he died intestate." *McDavid v. Fiscar*, 342 Ill.App. 673, 680–81, 97 N.E.2d 587, 590 (1951); *see Means v. City of Chicago*, 535 F.Supp. 455, 465 (N.D.Ill.1982). William Davis would have taken under Illinois probate law, and hence he qualified as "next of kin" under the Act. The term "pecuniary injury," as used in the Act, generally means lost financial support from the decedent, but in this case it was uncontested that William received no financial assistance from his father and had no reasonable expectation of receiving such assistance in the future. The district court recognized that there could be no recovery for lost financial support, and hence the court instructed the jury to calculate "pecuniary injury" by considering solely "the companionable relationship between the decedent and his son and

the loss of his father's society and companionship." Appellant maintains that the lack of evidence concerning William Davis' lost society and companionship is fatal to his claim under the Wrongful Death Act.

Appellant also assigns error to the judge's instruction to the jury, arguing that as a matter of law an adult child may never recover for lost society and companionship with a parent under the Illinois Wrongful Death Act. We note that no Illinois court has yet decided whether an adult child's lost society and companionship with a parent is an element of pecuniary injury. The Illinois Supreme Court has held or strongly implied that loss of society or consortium is an element of pecuniary injury in the context of three other familial relationships, *see Bullard v. Barnes*, 102 Ill.2d 505, 82 Ill.Dec. 448, 468 N.E.2d 1228 (1984) (parent may recover for loss of society of deceased minor child); *Elliott v. Willis*, 92 Ill.2d 530, 65 Ill.Dec. 852, 442 N.E.2d 163 (1982) (pecuniary injury includes loss of consortium suffered by widowed spouse); *Hall v. Gillins*, 13 Ill.2d 26, 147 N.E.2d 352 (1958) (implying that minor child may recover under the Illinois Wrongful Death Act for lost companionship, guidance, advice, and affection of deceased father), but those opinions focus only on the specific relationships at issue and, in our view, afford no guidance on the issue appellant urges us to decide. In a case such as this, where a question exclusively one of state law is at issue and where state decisional law gives no key as to its probable resolution by the courts of the state, we would ordinarily strongly consider certifying the question to the state's supreme court. In the instant case, however, certification would be a superfluous measure. Even if the Illinois Supreme Court were to advise us that an adult child's loss of society and companionship with a parent is an element of pecuniary injury, we would still agree with appellant's fundamental point that the evidence adduced at trial cannot sustain an award in William Davis' favor.

■ This was a case of a twenty-eight year old married individual who never lived

with his father. There was only one six-month period during William's life in which his father was released from mental institutions. During that period, William met his father on brief visits to his grandparents' house. For the last ten years of his father's life, William paid, on the average, one monthly visit to his father. Those visits each lasted approximately forty-five minutes. Davis spoke to his son on one, or perhaps two, occasions during the entire ten-year span. The trial record reveals that those conversations were abbreviated, perhaps limited to three or four words from Clyde. On cross-examination, William admitted that his father did not even recognize his son on "ninety-nine percent of the [visits]." Davis generally looked "puzzled" when his son arrived and stared blankly when his son spoke. It was only "once in a great while" that Davis appeared to comprehend any of the words his son spoke to him.

On the basis of the trial record, we believe that jurors in a fair and impartial exercise of their judgment could reach but one conclusion, namely that William suffered no loss of society or companionship when his father died. This naturally does not mean that a son or daughter of a handicapped person must always suffer a directed verdict on the issue of lost society. A child who spends a considerable amount of time with a severely disabled parent may very well learn to understand the parent's signals and gestures. It is entirely possible that in such an instance the loss of a parent would deprive the child of considerable society and companionship. In the instant case, however, where a son visited his father on the average of once per month, and then only for forty-five minutes, and by the son's own admission his father did not show any sign of recognition "ninety-nine percent of the time," the issue of lost society should have been taken from the jury.

 We are mindful of the fact that the Illinois Supreme Court has on one occasion found that a survivor is entitled to a rebuttable presumption of pecuniary injury when he loses the society of a close relative. In *Bullard, supra,* the Illinois Supreme Court held that a parent of a deceased minor child is presumed to suffer pecuniary injury on the basis of lost society. The fact that the Illinois Supreme Court spoke in terms of a rebuttable presumption does not affect our decision to forego certification. It is unlikely that the Illinois Supreme Court would hold that an adult child is entitled to a presumption of pecuniary injury when he loses the society of a parent. Moreover, even if the Illinois Supreme Court were to advise us that a rebuttable presumption of pecuniary injury did obtain when an adult child seeks recovery for lost society with a parent, we would still hold that the district court erred when it failed to take from the jury the issue of William Davis' loss. Under Illinois law, a rebuttable presumption is not itself evidence. *McElroy v. Force,* 38 Ill.2d 528, 232 N.E.2d 708 (1968). Rather, a presumption only has the effect of shifting to the party against whom it operates the burden of production. *Id.* If the opponent offers evidence that contradicts the presumed fact, the presumption disappears. *Id.* The presumption merely permits the party relying upon it to survive a motion for directed verdict at the close of his case, but once the opponent introduces evidence sufficient to rebut the presumed fact, the presumption serves no further function at trial. *Diederich v. Walters,* 65 Ill.2d 95, 2 Ill.Dec. 685, 357 N.E.2d 1128 (1976). Appellant's evidence rebutted any presumed loss of society on William's part, and hence the district court properly could have directed the verdict in appellant's favor.[2]

C. Enforcement of the Settlement Agreement

 Appellant raises several additional arguments on appeal, but most are rendered moot by our resolution of the appeal from the denial of the motion to enter

---

**2.** The Illinois rule on the effect of a presumption governs in this federal case because state law provides the decisional rule with respect to loss of society. *See* Fed.R.Evid. 302.

judgment notwithstanding the verdict. Among the arguments that have not been rendered moot, only one appears to us to merit the serious attention of this court. Appellant maintains that William Davis entered into a binding settlement agreement on August 14, 1981, and that the district judge erred when he refused to enforce the agreement. After reviewing the evidence introduced at the hearing held in the trial court on the issue of enforceability, we believe that William Davis' oral communication to his lawyer's secretary and the acceptance by attorneys Bown and Martin lacked the definiteness requisite to an enforceable contract. *See Lyles v. Commercial Lovelace Motor Freight, Inc.,* 684 F.2d 501, 504 (7th Cir.1982); *United States v. Orr Construction Co.,* 560 F.2d 765, 769 (7th Cir.1977). As one would expect, federal law and Illinois law are identical on the issue of definiteness as a requisite to enforceability. *See Jones v. Eagle II,* 99 Ill. App.3d 64, 54 Ill.Dec. 350, 424 N.E.2d 1253 (1981); *Calo, Inc. v. AMF Pinspotters, Inc.,* 31 Ill.App.2d 2, 176 N.E.2d 1 (1961). It is thus of no moment, and we need not decide, whether the enforceability of any of the settlement terms is governed by state as opposed to federal law.

On August 14, 1981, William Davis' anticipated suit was highly complex, involving numerous potential defendants, some of whom were possibly liable under Section 1983, and some of whom could at most incur liability under state negligence law. The lawyers for the potential parties to the suit recognized the complexity of the case and accordingly contemplated drafting written releases that would define each party's rights and obligations. The execution of written releases never came about, and the defendants now wish to construe William Davis' communication to his lawyer's secretary that he would "settle for $25,000 clear" as an offer from which the parties' rights and obligations can in fact be divined. The communication, as the parties themselves recognized on August 14, is vague. It is unclear from the record whether William Davis desired to settle with each defendant for $25,000 or with all

for a total of $25,000. It is furthermore uncertain whether the $25,000 was in settlement of the Eighth Amendment claims alone or also in settlement of the state law negligence claims. In short, on August 14 the parties had not yet agreed upon a specific set of terms of settlement. The nature of defendants' liabilities remained uncertain pending the signing of the releases, and we thus hold that the district court correctly denied enforcement of the "settlement agreement."

## CONCLUSION

It is difficult to read the facts of this case without sensing moral outrage over the gruesome death of Clyde Davis. Yet the fact remains that with respect to appellant, Davis' estate had nothing more than a negligence action. Although Counts 1 and 2 of the complaint tried to frame appellant's liability in constitutional terms, it is plain that appellant inflicted no cruel or unusual punishments on Davis. One must act with callous indifference towards the dangers faced by an inmate before one incurs liability in a Section 1983 action for a violation of the Eighth Amendment, and the trial record simply does not support a finding that appellant possessed that state of mind. William Davis sought to increase the size of the award by adding a wrongful death count, but Clyde Davis provided William with no demonstrable financial assistance, and the record cannot sustain a finding that William suffered a loss of society or companionship when his father died. We consequently VACATE the district court's entry of judgment with respect to Counts 1, 2, and 3. The jury's award on Count 4 is the only award that we believe should be upheld. The award on Count 4 was based upon appellant's negligence, and appellant properly incurred liability to the estate of Davis for Davis' pain and suffering. The cause accordingly is REMANDED to the district court with instructions to enter judgment for defendant on Counts 1, 2, and 3, and to enter judgment for plaintiff on Count 4 in the amount of $50,000, less any

appropriate set-off for the prior settlement with the Nightingale Manor nursing home.