Eric JELINEK, Plaintiff–Appellant,

v.

James GREER, former Warden of Menard Correctional Center, Jim Bush, Assistant Warden, Alan L. Frentzel, Assistant Warden, et al., Defendants–Appellees.

No. 95–1306.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1995.

Decided July 23, 1996.

Mark E. Wohlberg, Chicago, IL and Barbara J. Clinite (argued), Chicago, IL, for plaintiff–appellant.

Terence J. Corrigan, Office of Attorney General, Criminal Appeals Division, Springfield, IL, and Paul Racette (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for defendants–appellees.

Before BAUER, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Violence in the prison system underlies the claim that Eric Jelinek attempted to bring under 42 U.S.C. § 1983. Severely injured when he was hit over the head with a barbell by an unidentified inmate, Jelinek alleged in his complaint that the defendant prison officials knowingly exposed him to the assault, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. The magistrate judge, proceeding by consent under 28 U.S.C. § 636(c)(1), granted summary judgment to the defendants. On this direct appeal from that judgment, we affirm.

Because this is an appeal from a summary judgment, the following account of the facts views them in the light most favorable to Jelinek. At the time the events in this suit occurred, Jelinek had been an inmate at the Menard Correctional Center, a state prison in Menard, Illinois, since 1985. In that year, the Northsider gang at Menard tried to recruit him, using such rough tactics as breaking his jaw. At Jelinek's request, he was placed in protective custody, where he apparently stayed until 1988. Perhaps re-thinking the situation, he joined the Northsiders upon his release from protective custody. In June or July 1989, the gang ordered him to "hit" (stab) correctional officer Fricke, who (as Jelinek describes it in his brief) was interfering with the operation of a grain alcohol still used to supply inmates with alcohol. Jelinek refused to carry out the hit, and instead he reported the plan to the Menard authorities. Fearing retribution from the gang, he again requested protective custody, and the prison officials again approved the request.

In October 1989, while still in protective custody, Jelinek was placed in disciplinary segregation after he intimidated and threatened a correctional officer. Although the segregation was initially to last for 90 days, he was released after 30 days and returned to protective custody. Around December 21, 1989, the prison officials conducted a review of his custody status. Jelinek urged them to keep him in protective custody, naming his enemies and the threats they had made as a result of his betrayal of the Northsiders. Unmoved by his pleas, defendants Jim Bush, T. O'Conner, Alan Frentzel, and W. Brieschke voted to deny further protective custody, and Warden Greer approved the denial. They indicated, however, that Jelinek was to be placed in "Group IV," a unit in the South Cellhouse. The vote sheet also reflects Jelinek's less than satisfactory performance while in the protective custody unit. It notes that he had "numerous fighting tickets in P.C.," that he had an overall "poor" disciplinary record, and that over a six-month period he had nine "tickets." In the space provided to explain a "no" vote on continued protective custody, the sheet states "Long H. of aggressive behavior in P.C.; no verifiable information to indicate a need for P.C." Finally, there is a notation on the sheet, in apparent conflict with the Group IV recommendation, that Jelinek could cell in the E.C.H. (East Cellhouse) or the W.C.H. (West Cellhouse) only.

Jelinek promptly sought reconsideration of the Warden's decision, and he wrote to the Illinois Department of Corrections about his fear for his life. The Department responded on January 2, 1990, stating that he would remain in protective custody until the Committee's decision could be reviewed. In the meantime, however, on December 29th Jelinek was transferred from the protective custody unit to a "kick-out" unit in the South Cellhouse for Group IV inmates. Jelinek himself notes that the Group IV kick-out unit is sometimes referred to as Group IV protective custody, but it is separate from the regular protective custody. Jelinek also appears to concede that there is a difference between Group IV and the general population, since he emphasizes that inmates from the general population had access to the Group IV unit due to lax security measures. For example, he suggests that Northsiders from the general population could slip into the Group IV yard through the shower area they used.

On January 2, 1990, shortly after Jelinek was placed in the Group IV kick-out unit, Menard lifted a lockdown that had been in effect since September 1989. Still fearful, Jelinek went to the yard to use the telephone to call his brother, to report his desperate situation. Within minutes of reaching the yard, someone—whose identity was never revealed for this record—struck him on the head with a dumbbell weight. He suffered numerous skull fractures and the loss of one eye. Two years to the day later, on January 2, 1992, Jelinek filed his § 1983 complaint, naming as defendants the five Menard officials who voted to remove him from protective custody and assign him to Group IV. On January 5, 1995, the magistrate judge granted summary judgment to all five defendants.

 In order to avoid summary judgment, Jelinek had to demonstrate the existence of sufficient evidence that, if believed

by a jury, would support a verdict in his favor. *Panozzo v. Rhoads*, 905 F.2d 135, 137 (7th Cir.1990). It is plain that prison officials have a duty under the Eighth Amendment to take "reasonable measures to guarantee the safety of the inmates," *Farmer v. Brennan*, —— U.S. ——, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994), *quoting Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984). See also *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Goka v. Bobbitt*, 862 F.2d 646, 649–650 (7th Cir. 1988). In order to succeed, Jelinek must show that there are genuine issues of fact regarding the subjective element of an Eighth Amendment claim described in *Farmer*.

■ *Farmer* held that a prison official, like all five defendants here, violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious. In a case based on a failure to prevent harm, like both *Farmer* and the present one, the inmate must show that "he is incarcerated under conditions posing a substantial risk of serious harm." 511 U.S. at ——, 114 S.Ct. at 1977. Second, the inmate must show that the prison official was "deliberately indifferent" to inmate health or safety. As we have had many occasions before to note, the Supreme Court said that "deliberate indifference" for these purposes means that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn … and he must also draw the inference." *Id.* at ——, 114 S.Ct. at 1979. Compare Model Penal Code § 2.02(c), and Comment 3 (1985) (defining "recklessly" as a standard of criminal culpability). See also *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir.1988) (en banc) (discussing recklessness as a form of deliberate conduct), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).

■ Here, Jelinek's sole complaint is directed against the prison officials' decision of December 21, 1989, to remove him from protective custody and to assign him to Group IV. He claims first that the objective risk of assault was serious and that confinement in Group IV posed a serious risk of harm to him. He asserts that the prison officials knew of that risk, because he pointed out his history with the Northsiders to them, and they disregarded it. The real reason, in Jelinek's view, that he was ejected from protective custody was not his poor disciplinary record, as noted on the record, but instead was retaliation for his altercation with the correctional officer in the protective custody unit. The question for us is therefore whether these allegations, taken together with any facts that are undisputed, suffice to get Jelinek over the summary judgment hurdle.

If the prison officials had immediately transferred Jelinek to the general population, it is possible that he might have had a claim. Yet that is not what they did. Although Jelinek and the officials debate at some length whether there is a difference between "true" protective custody and Group IV status, and whether Group IV is more like the general population or more like protective custody, it is plain that Group IV classification is more restricted than general population classification. In keeping with Jelinek's version of events, we assume that Group IV is not the same as regular protective custody, and thus that he was less protected after his transfer to Group IV. We also assume, again in keeping with Jelinek's account, that security lapses were possible and in fact occurred from time to time, such that general population inmates could slip into the Group IV yard.

Even thus giving Jelinek the benefit of the doubt, we agree with the magistrate judge that he did not bring forward enough evidence to survive summary judgment. One would have to assume that the five defendants, voting to put Jelinek in Group IV, knew that their own security system was working poorly, that a lapse was likely to occur, that a gang member would slip into the yard through the shower when Jelinek was present, and that harm would come to Jelinek as a result. In fact, for understandable reasons, Jelinek does not even know who hit him, and it is thus hard to say whether the harm he feared actually came to pass, or if some other violent inmate for his own

reasons decided to assault Jelinek. Nothing in the record indicates that the assaulter in fact was a general population inmate who had no business in the Group IV yard, as opposed to a Group IV inmate. The record clearly shows that the prison officials did *not* decide to return Jelinek to the general population, which might have raised an issue of fact about their intent to leave him exposed to gang retribution. Only the most speculative chain of reasoning, unsupported by concrete evidence, therefore supports Jelinek's Eighth Amendment theory.

On the other side, the officials documented their reasons for the December 21 decision on the protective custody vote sheet, and Jelinek does not dispute any of the underlying facts listed there. It is clear from the sheet that Jelinek had been a constant troublemaker in the protective custody unit. Even assuming that his assault on the correctional officer was the last straw for the prison officials, he had been given no fewer than sixteen tickets for fighting over the time he had been in the unit, with nine tickets over a six-month period. This is not to say that Jelinek somehow waived his right to physical safety within the prison. It is only to indicate that he provided the prison officials with ample legitimate reasons for the transfer, and that he has not attempted to refute this fact with any evidence whatsoever. Two of the officials—Brieschke and O'Connor—indicated on the vote sheet that they thought Jelinek should be transferred to either Statesville or Pontiac, both higher security facilities.

Because Jelinek offered no evidence tending to show that the defendant officials knowingly disregarded a serious risk of harm to him when they voted to put him in Group IV, and there is furthermore no evidence that the gang violence Jelinek feared was the cause of his injuries (serious though they were), we AFFIRM the judgment of the district court.