107 F.3d 549
 Tommy Ray LEWIS, Plaintiff-Appellant,
v.
Thomas D. RICHARDS, et al., Defendants-Appellees.
 No. 95-3785.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 23, 1996.
Decided Feb. 24, 1997.
 
 Dave Welter (argued), Valparaiso University Law Clinic, Valparaiso, IN, for Plaintiff-Appellant.
 Pamela Carter, Anthony Overholt (argued), Office of the Attorney General, Indianapolis, IN, for Defendants-Appellees.
 Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 This case involves the prison problem of coping with violence. Tommy Ray Lewis, a state prisoner, sued several employees and officials at the Westville (Indiana) Correctional Center ("WCC"), claiming that they violated his Eighth Amendment[1] right to be free from cruel and unusual punishment by being deliberately indifferent to three separate sexual assaults to which Lewis was subjected. The district court granted summary judgment to defendants. Lewis appeals, arguing that unresolved issues of material fact--namely, whether defendants were aware of, and disregarded, a substantial risk to his health and safety in the form of sexual assaults by gang members in the prison--precluded summary judgment. We modify the judgment, and affirm as modified.
 
 I.
 
 2
 Because this is an appeal from summary judgment, we view the facts in the light most favorable to Lewis. Jelinek v. Greer, 90 F.3d 242, 243 (7th Cir.1996). Lewis was serving a four-year sentence at the WCC. He was housed with the general prison population in November of 1990. At no time before the first attack had he ever advised prison authorities that he feared that he was in danger, nor had he requested that he be housed separately from any other inmates.[2] On November 23, two inmates beat and sexually assaulted Lewis in one of the prison dormitories. Lewis maintains that both were members of the Gangster Disciples, a gang which, as defendants concede, is one of the predominant gangs among inmates at the WCC. Lewis maintains that he immediately reported the attack to the officer in charge of the dormitory. The officer never reported this incident to his superiors. His only response, according to Lewis, was to make a number of snide and vulgar comments about the incident. Subsequently, Lewis says that about twenty members of the Disciples, including the two who had committed the rape, confronted him and threatened him with physical harm if he told anyone else about the attack. Lewis inferred that the officer he told (whose employment at the prison was later terminated for reasons unconnected to this case) relayed the information to the gang members instead of passing the information up the prison's chain of command, as he was supposed to do. Lewis took no further action until April 18, 1991, when he again reported the same offense to two different prison officials after visiting the prison infirmary, seeking medical treatment for venereal warts which, according to Lewis, he contracted as a result of the attack.
 
 
 3
 When he reported the rape on April 18th, Lewis claims that he also requested protection from those inmates who had perpetrated the assault upon him, and further claims that he had informed the defendant prison authorities that his attackers were members of the Disciples gang, and also asked for an investigation into gang violence at the WCC. Defendants responded and continue to maintain that Lewis neither identified his attackers nor sought protective custody. Eventually Lewis was transferred to a different dormitory. On June 3, 1991, Lewis claims that several Gangster Disciples again threatened and harassed him about being a "snitch," asking if he was informing on gang members during visits to the infirmary. Lewis says he did not report this initial June 3d encounter because he feared retaliation for being a snitch. That night, in the dormitory's bathroom, Lewis was again sexually assaulted by two different inmates, both, according to Lewis, members of the Disciples. His attackers, who were not separatees of Lewis (supra note 1), also choked him and stabbed him with a knife. Lewis immediately reported the second attack, and received medical attention for his wounds. The next day, Lewis filed a grievance with prison officials, complaining about the June 3d rape and attack.
 
 
 4
 Lewis was placed in protective custody ten days later on June 13, 1991, and remained there almost two years. Lewis claims that Gangster Disciples members, especially an inmate named Schaefer, who was one of the perpetrators of the second rape and served food to inmates at the prison mess hall, continued to harass him while he was in protective custody. On March 10, 1992, Lewis filed suit in federal district court under 42 U.S.C. § 1983, claiming that defendants were deliberately indifferent to his safety because they knew about and ignored the threat which the Disciples posed, and thus their failure to protect him from the two sexual assaults violated his constitutional rights.
 
 
 5
 On March 14, 1993, while the lawsuit was pending, Lewis allegedly physically attacked a nurse who was treating him for chest pains. Prison officials placed Lewis on a suicide prevention watch[3] and transferred him to a seclusion cell in the prison psychiatric unit. Three days later, a psychiatric team determined that Lewis was no longer suicidal and could be moved out of the psychiatric unit. In accordance with the WCC's standard practice, Lewis was removed from the seclusion cell on March 17th and placed in the general population dormitory of the psychiatric unit, pending a return to the protective custody unit. Lewis insists that he protested being placed in the psychiatric unit's general population dormitory, and reminded prison officials that he had protective custody status.
 
 
 6
 Lewis claims that on the night of March 18, 1993, three inmates raped him in the general population dormitory of the psychiatric unit, telling him they were doing it "for Schaefer," the inmate who perpetrated the second assault and, according to Lewis, verbally harassed him throughout his tenure in protective custody. Lewis concedes that neither the three inmates who raped him nor any other resident of the psychiatric unit's general population dormitory were listed as separatees of his.
 
 
 7
 The government presents a quite different version of the March 18th incident: the warden on the psychiatric unit observed suspicious behavior near Lewis' bed, and apprehended Lewis and three other inmates on suspicion of engaging in sexual activity with Lewis. Lewis was charged with engaging in consensual sexual activity, and the WCC's Conduct Adjustment Board ("CAB") found him guilty of the charged offense of participating in consensual sexual activity after a disciplinary hearing. Lewis, who lost six months' good-time credit, did not appeal the CAB's decision. He did, however, amend his lawsuit to include the third alleged attack. After discovery, the district court granted defendants' motion for summary judgment, ruling that Lewis failed to present evidence that he had provided defendants with actual knowledge of threats to his safety for each of the incidents to which he referred. Lewis appeals.
 
 II.
 
 8
 Lewis argues that the district court should not have granted defendants' motion for summary judgment, because he presented evidence sufficient to establish that defendants knew of the risk to his safety, and disregarded it. We review a grant of summary judgment de novo, and will affirm only where there exist no disputed issues of material fact. Griffin v. City of Milwaukee, 74 F.3d 824, 826-27 (7th Cir.1996); Fed.R.Civ.P. 56(c).
 
 
 9
 "[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 831-33, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994); Langston v. Peters, 100 F.3d 1235, 1237 (7th Cir.1996). Failure to provide such protection, however, violates the Eighth Amendment's prohibition of cruel and unusual punishment only if "deliberate indifference by prison officials [to the prisoner's welfare] effectively condones the attack by allowing it to happen[.]" Haley v. Gross, 86 F.3d 630, 640 (7th Cir.1996); Jelinek, 90 F.3d at 244. Thus, in order that he might sustain his Eighth Amendment claim, Lewis must demonstrate that the defendants had "actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." McGill v. Duckworth, 944 F.2d 344, 348 (7th Cir.1991). It is not enough that a reasonable prison official would or should have known that the prisoner was at risk: the official must actually know of and disregard the risk to incur culpability. Farmer, 511 U.S. at 837-38, 114 S.Ct. at 1979.
 
 
 10
 A. The Attacks of November 23, 1990 and June 3, 1991
 
 
 11
 After reviewing the record, we are convinced that Lewis failed to present sufficient evidence regarding the first two attacks (on November 23 and June 3) to survive summary judgment. Lewis in effect concedes that prior to the first attack, prison officials had no knowledge that he was at risk, for he neither advised any of the authorities that his safety was in jeopardy,[4] nor has he pointed out other facts or information the prison officials might have had at their disposal that would have led them to conclude that he was at risk. Farmer, 511 U.S. at 838-42, 114 S.Ct. at 1981-82; see infra at 10-11. Without such knowledge, defendants can hardly have been deliberately indifferent to Lewis' safety. See Goka v. Bobbitt, 862 F.2d 646, 647-48 (7th Cir.1988). Neither, prior to the second attack, did Lewis specifically seek protection from the two inmates who assaulted him on that occasion, identify the twenty gang members who threatened him after the first rape, or inform authorities of the threats which were made against him earlier in the day of the second attack. Therefore, Lewis did not demonstrate that the defendants had specific knowledge of a threat to Lewis by the inmates who assaulted him.
 
 
 12
 Lewis did present sworn testimony that when he reported the first attack on April 18, 1991, he made prison officials aware that the Disciples had targeted him, and had requested but was refused protective custody. Therefore, he argues, any subsequent attack by a member of the gang suffices to establish that defendants were deliberately indifferent to his safety. We disagree. It is true that courts may infer "deliberate indifference to a known hazard" where prison officials fail to protect an inmate who belongs to an identifiable group of prisoners for whom the risk of assault is a serious problem of substantial dimensions, including prisoners targeted by gangs. Langston v. Peters, 100 F.3d at 1239; Walsh v. Mellas, 837 F.2d 789, 795-96 (7th Cir.1988). Nonetheless, the fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety. To succeed on the theory that defendants consciously ignored the threat posed by "gang targeting," Lewis must demonstrate that the defendants either took no precautions to avoid a known hazard which the gang presented, or that the precautions they took ignored the risk which targeted inmates faced. Id.
 
 
 13
 Had the defendants in this case simply refused to do anything, Lewis' case might survive summary judgment. But the record speaks otherwise. They transferred Lewis to a different area in the prison, rather than placing him in protective custody.[5] Almost five months had passed without incident since the first attack, defendants point out, and thus immediately prior to the second attack, there was no indication that Lewis was in imminent danger. And because Lewis failed to inform prison officials when gang members in the new dorm made more threats against Lewis for being a "snitch," officials had no way of knowing that he was in heightened peril. See Estate of Davis v. Johnson, 745 F.2d 1066, 1071 (7th Cir.1984) (to demonstrate callous indifference to inmate safety, plaintiff must show a "strong likelihood" of violence). Even assuming, as we must for purposes of summary judgment, that the defendants were aware of the fact that Lewis needed protection from the Disciples, subsequent events proved at best that the defendants exercised poor judgment in simply choosing to send Lewis to a different dormitory. Exercising poor judgment, however, falls short of meeting the standard of consciously disregarding a known risk to his safety. McGill v. Duckworth, 944 F.2d at 348.
 
 
 14
 Moreover, to survive summary judgment Lewis must present some evidence, beyond the bare allegations of his complaint, not only that the inmates who assaulted him on June 3 were members of the Disciples, but also that the defendants were aware of their gang affiliation. See Adler v. Glickman, 87 F.3d 956, 958 (7th Cir.1996); Fed.R.Civ.P. 56(e). He has not done so. Defendants conceded that they know gang activity occurs at the WCC, and that the Gangster Disciples are one of the more predominant prison gangs. But the defendants also presented evidence that it is the policy at the WCC not to segregate inmates based on gang affiliation, in part on the reasonable theory that such segregation would enhance the power of the prison gangs, and in part because it would result in racial segregation within the prison. Instead, defendants indicated that the WCC employs a gang coordinator, who maintains a list of all suspected gang members, and attempts to screen known predatory gang members. Such screening does not always achieve the desired result, the defendants responded, because gang members in Indiana prisons usually refuse to disclose their membership or affiliation with a gang, and do nothing to publicize this information. While we are aware of at least one case from this court that prisoners in Illinois penitentiaries do not hide their gang affiliations, see, e.g., David K. v. Lane, 839 F.2d 1265 (7th Cir.1988), Lewis failed to refute the defendants' assertion, nor did he depose the official responsible for maintaining the list of gang members. Lewis has not presented evidence indicating that the defendants knew, before the second attack, that the inmates who assaulted him belonged to the Disciples--or even that there were other inmates in the new dormitory known to prison officials as members of that gang who might pose a threat to Lewis. As a result, even when viewing the record in the light most favorable to Lewis, Lewis has failed to convince us of anything except that the procedures at the WCC leave something to be desired when attempting to screen out predatory gang members, resulting in egregious lapses in security at the prison. Obviously this reflects very poorly on the defendants, but it certainly falls short of being sufficient to maintain a claim under the Eighth Amendment. See Langston v. Peters, 100 F.3d at 1239.
 
 
 15
 Alternatively, Lewis argues that defendants' failure to protect him violated that Eighth Amendment because gang violence was so prevalent at the WCC that it created a virtual "reign of terror." Pervasive violence in a prison may create unconstitutional conditions of confinement. See James v. Milwaukee County, 956 F.2d 696, 700 (7th Cir.1992); Walsh v. Brewer, 733 F.2d 473, 476 (7th Cir.1984). To support his argument, Lewis presented evidence that the WCC in recent years began receiving a more violent class of offender, as well as evidence that requests for protective custody increased dramatically after 1989. The evidence Lewis presented, however, demonstrates that the increase in requests for protective custody resulted at least in part from a significant change in prison policy: before 1989, prisoners were screened to make sure they had valid reasons for seeking protective custody. In 1989, the policy was expanded to give protective custody to anyone who sought it, regardless of whether the inmate had any evidence or reason to believe that his safety was in danger. And Lewis' own evidence indicated that prisoners sought protective custody for reasons other than fear of inmate-on-inmate violence. Lewis failed to establish how many of the requests for protective custody were the result of prison violence, let alone how many were gang-related. Neither did he present evidence of the number or frequency of incidents of inmate-on-inmate violence at the WCC. The evidence, in short, is woefully inadequate to establish that violence at the WCC was so pervasive that it violated the Eighth Amendment.
 
 
 16
 Finally, Lewis argues that the three attacks upon him which are the subject of this lawsuit, in and of themselves, are indicative of pervasive violence at the WCC. This argument, even if we were to include the third alleged assault, lacks merit. We have no doubt that multiple sexual assaults are devastating to the victim, and do not belittle the resultant trauma. But three attacks upon a single inmate are insufficient to let us classify an institution as suffering from pervasive violence.
 
 B. The Attack of March 18, 1993
 
 17
 Disputed facts concerning defendants' knowledge of threats to Lewis' safety at the time of the third alleged assault, which took place in the prison psychiatric unit, make the district court's grant of summary judgment on that issue appear more problematic: although defendants maintain that the incident was consensual, Lewis insists he was raped. Furthermore, prison officials knew Lewis had long been in protective custody and were planning on returning him to such custody, while Lewis presented evidence that he protested being placed, even temporarily, in the general population of the psychiatric unit. Moreover, Lewis had previously filed this lawsuit, claiming that failure to protect him from the first two sexual assaults violated his civil rights. We need not decide whether the incident in the psychiatric unit presents disputed issues of material fact precluding summary judgment, however, because Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) bars Lewis' claim. Heck bars recovery of damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid." Id. at 486, 114 S.Ct. at 2372. We apply the rationale of Heck to prison disciplinary hearings. Miller v. Indiana Dep't of Corrections, 75 F.3d 330 (7th Cir.1996).[6] The result is that Heck "precludes monetary relief while a prison disciplinary order stands." Evans v. McBride, 94 F.3d 1062, 1063 (7th Cir.1996). Even though Lewis is not seeking to have his lost good-time credits restored, if Lewis were awarded damages premised on the assumption that he was raped in the psychiatric unit, it would necessarily call into question the CAB's finding that he violated prison rules by engaging in consensual sex. For this reason, no claim for damages under § 1983 can accrue until such time as the result of the disciplinary hearing has been invalidated. Heck, 512 U.S. at 486-87, 114 S.Ct. at 2372. Thus, the claim is not cognizable under § 1983, and the district court should have dismissed it for failure to state a claim under Fed.R.Civ.P. 12(b)(6).
 
 CONCLUSION
 
 18
 We are not unsympathetic to the trauma Lewis experienced while incarcerated at the WCC. And we once again urge prison officials to take any and all reasonable steps to stamp out gang violence in their respective institutions. See, e.g., David K. v. Lane, 839 F.2d at 1277-78. Nevertheless, we conclude that Lewis has failed to present evidence sufficient for a reasonable factfinder to conclude that the defendants knew of the impending risk to his safety, and consciously refused to prevent it. Jelinek, 90 F.3d at 243-44. As stated before, Lewis' claim regarding the third incident is not cognizable under § 1983. Accordingly, we MODIFY the judgment of the district court and dismiss without prejudice Lewis' complaint with respect to the third incident for failure to state a claim, and AFFIRM the judgment as modified.
 
 
 19
 FLAUM, Circuit Judge, concurring.
 
 
 20
 A prison official who fails to prevent a substantial risk of serious harm from ripening into actual harm to a prisoner will escape liability, provided that the official was actually unaware of the risk or took reasonable steps to prevent the harm. So holds Farmer v. Brennan, 511 U.S. 825, 846-48, 114 S.Ct. 1970, 1984, 128 L.Ed.2d 811 (1994). After some hesitation, I agree that Lewis cannot meet the requirements of Farmer, and therefore concur in the judgment. Nevertheless, because I believe that Lewis's claims present a closer case than the majority's opinion might suggest, I write separately to express my concerns.
 
 
 21
 At the outset, I wish to underscore a point of agreement with the majority: the district court's grant of summary judgment with respect to the third assault is indeed "problematic." Twice the victim of brutal attacks, Lewis already had initiated this action when the third incident occurred. With respect to this alleged assault, therefore, the defendants should not be permitted to take refuge in their professed ignorance of Lewis's fears. Cf. Farmer, 511 U.S. at 846 n. 9, 114 S.Ct. at 1983 n. 9 ("If, for example, the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness ....") (discussing subjective component in suits for injunctive relief). Yet because the CAB determined that Lewis was not assaulted in the psychiatric unit, but rather was participating in consensual sex, the majority opinion correctly holds that Miller bars his claim. By dismissing without prejudice Lewis's complaint with respect to the third assault, the majority leaves open the possibility that, should the Supreme Court differ with the conclusion we reached in Miller, Lewis could renew his suit. I agree with this disposition.
 
 
 22
 Once the third assault drops from the picture, only the second assault arguably supports a claim of deliberate indifference, for it is undisputed that, prior to the initial rape, the defendants had no reason to believe that Lewis was in danger. I concur in the judgment only because I do not believe that the defendants' response upon learning in April of the first rape, which took place the previous November, can fairly be characterized as a failure to take reasonable steps to avert future harm to Lewis. See Farmer, 511 U.S. at 844, 114 S.Ct. at 1982-83 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). I am unable, however, to endorse the majority's language, which, in my view, reflects an overly constrictive view of Farmer.
 
 
 23
 Particularly of concern to me is the majority's failure to acknowledge that a factfinder may infer a subjective mental state from the existence of an obvious risk. "Whether a prison official had the requisite knowledge of a substantial risk," Farmer instructs, "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, cf. Hall[, General Principles of Criminal Law] 118 (cautioning against 'confusing a mental state with the proof of its existence'), and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." 511 U.S. at 842, 114 S.Ct. at 1981. Given this instruction, the majority's emphasis upon the adequacy of Lewis's pleas for protection strikes me as inappropriate.* The Farmer Court clearly envisioned that a jury would hear claims like Lewis's, even in cases where a seasoned jurist might conclude that proof of subjective awareness was tenuous:When instructing juries in deliberate indifference cases with such issues of proof, courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known, and juries should be instructed accordingly.
 
 
 24
 511 U.S. at 843 n. 8, 114 S.Ct. at 1982 n. 8. In the view of the Supreme Court, the safeguard against jurors whose outrage at prison violence might lead them to sanction officials in the absence of an Eighth Amendment violation is not a relaxed summary judgment standard, but jury instructions that properly convey the applicable law. Lower federal courts, in my view, should exhibit a similar faith in the willingness of juries to follow the law.
 
 
 25
 With respect to the second assault, the majority is willing to assume, as it must for purposes of summary judgment, "that the defendants were aware of the fact that Lewis needed protection from the Disciples." It therefore acknowledges that "[h]ad the defendants in this case simply refused to do anything, Lewis' case might survive summary judgment." This standard, however, is not Farmer 's. Under Farmer, prison officials "may be found free from liability if they responded reasonably to the risk." 511 U.S. at 844, 114 S.Ct. at 1982-83 (emphasis added). "[S]ubsequent events," the majority suggests, "proved at best that the defendants exercised poor judgment.... Exercising poor judgment, however, falls short of meeting the standard of consciously disregarding a known risk to his safety." But the officials' response to Lewis's request speaks to whether the officials "disregard[ed] that risk by failing to take reasonable measures to abate it," Farmer, 511 U.S. at 825, 114 S.Ct. at 1970, not to whether they had actual knowledge of the risk. The majority appears to conflate Farmer 's requirement of subjective awareness with its requirement that officials take reasonable measures to avert harm once they have become aware of danger. In doing so, the majority could be read to suggest that a plaintiff in Lewis's position need prove, not only that officials knew of a risk of harm, but also that they "refused to do anything" in response. Farmer, of course, does not set so heavy a burden. Minimal gestures in response to known risks will not absolve prison officials of liability.
 
 
 26
 I remain acutely aware of the "logistical nightmare" prison gangs create for prison administrators, see Babcock v. White, 102 F.3d 267, 268 (7th Cir.1996), and believe judges must resist any temptation to second-guess officials who have taken reasonable steps to deal with specific threats of gang violence, even when those measures ultimately prove unsuccessful. For this reason I concur in today's judgment. Nevertheless, cases such as Lewis's remind us that, far from being unusual, gang violence remains an ever-present reality of prison life. We must not abandon the effort to develop a balanced jurisprudence, one that is sensitive to the unique difficulties of prison administration, but which recognizes that "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society,' " Farmer, 511 U.S. at 834, 114 S.Ct. at 1977 (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).
 
 
 
 [1]
 Lewis originally claimed that defendants violated both his Eighth and Fourteenth Amendment rights. Lewis, however, was incarcerated and there had been a formal adjudication of guilt against him at the time of the alleged attacks. Therefore, the relevant constitutional provision is the Eighth Amendment, rather than the due process clause of the Fourteenth Amendment. City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983)
 
 
 [2]
 When a prisoner believes other inmates pose a threat to him, he may ask to be housed separately from such inmates. Prison officials refer to these inmates as "separatees" of the inmate seeking protection. The use of separatees is designed to provide increased security for inmates, both in protective custody and in the general population, by keeping threatening inmates away from the inmate requesting separatee status. Defendants concede that prison officials are on notice that listed separatees may pose a danger to the inmate who has sought such protection
 
 
 [3]
 The record does not make it clear why prison officials deemed Lewis to be suicidal. Lewis himself claims that rape-induced psychological trauma caused him to suffer from a severe anxiety attack at the time he allegedly attacked the nurse
 
 
 [4]
 Indeed, nothing in the record suggests that Lewis himself was aware that he was in jeopardy prior to the first attack
 
 
 [5]
 Lewis presented evidence that the WCC has a policy of providing protective custody to any offender who requests it, regardless of whether there is any evidence or reason to believe that his safety is in danger (see infra), and suggests that the fact that the defendants failed to follow their own policy is evidence of their deliberate indifference to his safety. But ignoring internal prison procedures does not mean that a constitutional violation has occurred. Langston v. Peters, 100 F.3d at 1238
 
 
 [6]
 Whether the rationale of Heck in fact applies to prison disciplinary hearings is now before the Supreme Court. Balisok v. Edwards, 70 F.3d 1277 (9th Cir.1995), cert. granted, ---- U.S. ----, 116 S.Ct. 1564, 134 L.Ed.2d 664 (1996). It is our policy to implement Miller "until the Supreme Court tells us otherwise." Evans v. McBride, 94 F.3d 1062, 1063 (7th Cir.1996)
 
 
 *
 Because the majority opinion does not distinguish among the various officials named in Lewis's suit, it fails to mention that the official who allegedly informed Lewis's tormentors of his complaints was dismissed by Lewis from this action prior to his appeal. I do not understand today's opinion to suggest that a prisoner could not succeed in a suit against an official who refused to relay to superiors the prisoner's request for protection and instead advised other prisoners of a "snitch" within their midst